THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROGER SUTHERLAND, | * | CIVIL ACTION NO.: |
| | * | 19-cv-414 |
| Plaintiff, | * | |
| | * | SECTION:    "R" (1) |
| versus | * | |
| | * | |
| | * | JUDGE:  VANCE |
| EDISON CHOUEST OFFSHORE, INC., | * | |
| OFFSHORE SERVICE VESSELS, | * | |
| LLC. and GALLIANO | * | MAG. JUDGE:  VAN MEERVELD |
| MARINE SERVICE, L.L.C. | * | |
| Defendants. | * | |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Roger Sutherland, who opposes Defendants', Edison Chouest Offshore, Inc. ("Edison Chouest"); Offshore Service Vessels, LLC ("Offshore Service"); and Galliano Marine Service, LLC ("Galliano") (collectively "Defendants"), Motion for Summary Judgment.

## I.    INTRODUCTION

Based on the following Opposition and exhibits attached hereto, the Court should deny Defendant's Motion for the following reasons: (1) Sutherland has a cause of action against all named Defendants based on the employer-employee relationship; (2) Sutherland can sue Offshore Service under the Americans with Disabilities Act ("ADA") and Age Discrimination in Employment Act ("ADEA") despite not being named in the EEOC charge; (3) the Galliano charge was timely filed; (4) Sutherland's Louisiana Employment Discrimination Law ("LEDL") claims were   timely filed; (5) Sutherland can fulfill a prima facie case of disability discrimination; and (6) Sutherland can fulfill a prima facie case of age discrimination.

## II.    **FACTUAL BACKGROUND**

Sutherland began his employment with Defendants[1] on February 17, 1998 as a Deck Hand.[2]  On or about April 25, 2012, Sutherland achieved the title of Master.[3]  According to the written job description of a Master,[4] Sutherland was responsible "to the company" for, among other things, "[t]he safety of life on board, maintaining a high level of performance by the vessel."[5]  His marine functions included the ability to "[i]dentify and respond to potentially hazardous conditions," "[p]articipate in safety and rescue drills for emergency situations," and Sutherland was also responsible for other emergency response functions.[6]  According to the job description, a Master is also required to meet certain physical demands, including "sufficient cardio-respiratory fitness to perform medium-heavy physical labor involving the ability to sit and/or stand for extended time frames, walk for prolonged periods, handle various tools, climb ladders, and climb stairwells."[7]

Because of the nature of maritime work, Defendants established various protocols and procedures, including the Drug and Alcohol Procedure ("the Procedure").[8] Pursuant to the Procedure, "[w]hen boarding the vessel for duty, each crewmembers must report...all medication (prescription or over-the-counter) he/she is taking."[9] As the Procedure explains, "[m]any

---

[1] Plaintiff will refer to Defendants collectively as joint employers for the purposes of this motion, as further discussed in Section III, B.

[2] Employment Log, Exhibit G.

[3] *Id.*

[4] In Defendants' memorandum (R. Doc 60-2), Defendants attempt to bolster their argument by misrepresenting the full Master job description and inserting favorable portions of the job descriptions without providing the entire quote.

[5] Master job description, Exhibit S.

[6] *Id.*

[7] *Id.*

[8] Drug and Alcohol Procedure Policy, at 11–12, attached hereto as Exhibit U.

[9] *Id.*

commonly prescribed and over-the-counter (OTC) medications are incompatible with safety-sensitive duties;" among other medications, clonidine is one of those prescribed medications.[10]

On November 14, 2017, Sutherland reported taking clonidine and another medication via a Medication Reporting Form.[11] This triggered Defendants' reporting protocols, and Sutherland was referred "to Family Medical Services [("FMS")] . . . for an evaluation by the CMO."[12] Pursuant to the Procedure, an individual assessment is to be made regarding the safety of the medication,[13] and Sutherland submitted to the evaluation with FMS on January 10, 2018.[14] Although he had been taking this medication for a minimum of two years, Sutherland stopped taking clonidine prior to this exam.[15] According to the January 10, 2018 exam by the CMO, Dr. Darren Duet, Sutherland had an "abnormal EKG" and an "irregular rhythm."[16]

Somehow, perhaps based on his "Spidey senses,"[17] Dr. Duet concluded that Sutherland *might be at risk* of coronary artery disease.[18] Dr. Duet asserts he uses the U.S. Coast Guard's Merchant Mariner Medical Manual ("the Manual") and the Guidelines on the Medical Examinations of Seafarers (the "Guidelines"), which is not guided by the U.S. Coast Guard,

---

[10] *Id.*

[11] Sutherland Medication Reporting Form, signed November 14, 2017, attached hereto as Exhibit V.

[12] Drug and Alcohol Procedure Policy, Exhibit U, at 11–12.

[13] *Id.*

[14] Sutherland January 10, 2018 Medical Evaluation, attached hereto as Exhibit W.

[15] Duet deposition, Exhibit M, pp. 71:24 - 72:12; Woodlands Medical Specialists letter dated December 19, 2017, attached hereto as Exhibit X

[16] According to the January 10, 2018 Pending Medical Records Form, attached hereto as Exhibit Y, which is provided to the patient, Sutherland's diagnosis was "abnormal EKG" and an "irregular rhythm." However, based on the FMS Post Incident Tracking Record, which notifies the employer of the employee's status, Sutherland was diagnosed with "hypertension" and "abnormal EKG." *See* Family Medical Services Post Incident/Tracking Record signed January 10, 2018, attached hereto as Exhibit Z. Dr. Duet has no explanation of the discrepancies between these two documents. Duet deposition, Exhibit M, pp. 87:15 - 88:1. Defendants address the Cardiology Clinic Note from Dr. Eilen Visit, attached hereto as Exhibit AA (noting Sutherland's past medical history); however, none of this information was known by FMS or Dr. Duet at the time of his January 10, 2018 evaluation nor is Sutherland's smoking habit noted in any of Dr. Duet's evaluation notes.

[17] Duet deposition, Exhibit M, pp. 50:19 - 51:3 (Duet uses his "Spidey senses" to rule out conditions when he recognizes signs and symptoms consistent with a disease state)

[18] Duet deposition, Exhibit M, pp. 28:13 - 29:2 (While an abnormal EKG, elevated blood pressure, heart rate, changes in vital signs, and being a man can put someone at risk for coronary artery disease, it is not a certainty that an individual has coronary artery disease.)

when determining if an individual is fit for maritime service.[19]  But after the January 10, 2018 evaluation, Dr. Duet wanted to ensure Sutherland could comply with the U.S. Coast Guard guidelines.[20]  As such, Dr. Duet restricted Sutherland from maritime service and instructed Sutherland to undergo further evaluation by a cardiologist, specifically an exercise stress test.[21]

Because Dr. Duet cannot diagnose coronary artery disease, he refers patients to a cardiologist,[22] and on February 21, 2018, Sutherland underwent a treadmill stress test with a cardiologist, Dr. Steven Eilen.[23]  Sutherland completed four minutes and twenty-two seconds of the test, reaching eighty percent of his age predicted maximum heart rate, and achieved 7 METS.[24]  To the extent Sutherland exercised during the stress test, he had no problems.[25] During the test, however, Sutherland experienced leg pain, which resulted in termination of the test.[26] Based on his evaluation and the stress test, Dr. Eilen released Sutherland to return to work with no restrictions.[27] Prior to Dr. Eilen approving this release, Sutherland made Dr. Eilen aware of his general job duties and responsibilities, as well as his job title.[28]  Although Sutherland did not provide Dr. Eilen with a written job description, Dr. Eilen's evaluation would not have changed

---

[19] Duet declaration, Exhibit R, at ¶ 4; Merchant Mariner Medical Manual, Exhibit O; Guidelines on the Medical Examinations of Seafarers, Exhibit P; Duet deposition, Exhibit M, pp. 45:7-9; 46:20-22 (Guidelines on the Medical Examinations of Seafarers is not guided by the U.S. Coast Guard.)  *Id.* at 46:8-19 (Some information within these resources is overlapping, while other information is conflicting; nonetheless, both guidelines are resources for mariner fitness)

[20] Duet declaration, Exhibit R, at ¶ 4; Duet deposition, Exhibit M, pp.110:14-111:9 (He wanted Sutherland to get "appropriate diagnostic tests for what [he] consider[ed] a probability of [Sutherland] having coronary artery disease.")

[21] January 10, 2018 Pending Medical Records Form, Exhibit Y; Duet declaration, Exhibit R,, at ¶ 5; FMS Post Incident/Tracking Record signed January 10,  2018, Exhibit Z; Duet deposition, Exhibit M, pp. 33:12-22; 34:4-8; 43:17 - 44:6

[22] Duet deposition, Exhibit M, pp. 42:19 - 43:16 (Dr. Duet generally suspects a diagnosis of coronary artery disease and leads the patient to someone who can diagnose the patient.  Dr. Duet can only diagnose someone with coronary artery disease if they walk into his clinic having a heart attack.)

[23] Stress Test Results, Exhibit Q

[24] *Id.*

[25] Eilen deposition, Exhibit N, p. 32:15-24

[26] *Id.* at pp. 33:22 - 34:4; 36:18 - 38:8; Stress Test Results, Exhibit Q

[27] Cardiology Clinic Note, Exhibit AA; Sutherland Return to Work Order, Exhibit T

[28] Eilen deposition, Exhibit N, pp. 10:6 - 11:11, 51:3-16; Stress Test Results, Exhibit Q

if he "knew that [Sutherland] worked 50 miles offshore with no medical personnel on board, and it could take them anywhere from one to ten hours to get ashore."[29]

On March 9, 2018, Dr. Duet reviewed the results of Sutherland's stress test, as well as Dr. Eilen release, and Dr. Duet maintained Sutherland's restriction from maritime service.[30] Based on Dr. Duet's restrictions, from January 10, 2018 until Sutherland no longer worked with Defendants, Sutherland was placed in a Mate position.[31] Although Dr. Duet reviewed Sutherland's EKG from Dr. Eilen, he did not take the EKG reading into consideration when limiting Sutherland to light duty.[32] Instead, Dr. Duet used the EKG and stress test results to "confirm[] [his] suspicions or concerns for coronary artery disease, which lead to [Sutherland's] restriction for maritime service."[33] On March 28, 2018, Sutherland was scheduled to work as a Mate at the Topship shipyard, a light duty position and a reduction in pay.[34] Finally, in September of 2018, Sutherland was informed that light-duty work was no longer available to him, and he was taken off the schedule.[35]

On November 1, 2018, Sutherland filed a charge of discrimination against FMS and Edison Chouest with the Equal Employment Opportunity Commission (the "EEOC"), alleging age and disability discrimination.[36] Then, on December 20, 2018, Sutherland filed a "Pre-Charge Inquiry" with the EEOC against Galliano.[37] Two days later, on December 22, 2018, the

---

[29] Eilen deposition, Exhibit N, pp. 31:21 - 32:2; Of note, there is no requirement that Dr. Eilen, or any cardiologist who performs an exercise stress test, be familiar with the federal guidelines regarding mariners' physical fitness standards.

[30] FMS Post Incident/Tracking Record signed January 10, 2018, Exhibit Z

[31] Employment Log, Exhibit G; Mate job description, attached hereto as Exhibit BB.

[32] Duet deposition, Exhibit M, p. 116:21-24

[33] *Id.* at pp. 116:25 - 117:8

[34] Employment Log, Exhibit G; Sutherland deposition, Exhibit H, pp. 129:25 - 130:14 (Sutherland's pay was reduced from $675.00 to $400.00 per day)

[35] Employment Log, Exhibit G; Sutherland deposition, Exhibit H, pp. 157:13-16; 158:1-6

[36] Sutherland's EEOC charge of discrimination against FMS, attached hereto as Exhibit CC; Sutherland's charge of discrimination against Edison Chouest, attached hereto as Exhibit DD.

[37] Sutherland's Pre-Charge Inquiry against Galliano, Exhibit I.

United States federal government shut down. Considered the longest government shutdown in history, it lasted until January 25, 2019. During this time, no one, including Sutherland, could communicate with the EEOC. On January 15, 2019, Sutherland sent correspondence to the EEOC requesting the Galliano charge and right to sue.[38] Because the EEOC was still closed at this time, he did not receive a response until February 20, 2019.[39] On March 6, 2019, Sutherland was able to sign a charge against Galliano, alleging age and disability discrimination.[40]

## III.    LAW AND ANALYSIS

### A.  Standard of Review for Defendant's Motion for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure states that a court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if the resolution of that fact in favor of one party could affect the outcome of the suit.[41] "A genuine dispute of fact exists only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[42] After the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, "the burden shifts to the nonmoving party to show significant probative evidence that there exists a genuine issue of material fact."[43] Factual controversies are resolved in favor of the nonmoving party, and the nonmoving party cannot fulfill its burden "if the evidence is merely colorable…or is not significantly probative."[44] Additionally, summary

---

[38] January 15, 2018 correspondence to the EEOC, Exhibit J.

[39] February 20, 2018 correspondence from the EEOC, Exhibit K.

[40] Charge of discrimination against Galliano, Exhibit L

[41] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986).

[42] *Dukes v. Zafiro Marine*, No. CV 15-4948, 2017 WL 1511614, at *3 (E.D. La. Apr. 27, 2017) (quoting *Anderson*, 477 U.S. at 248).

[43] *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citation omitted).

[44] *Dukes*, No. CV 15-4948, 2017 WL 1511614, at *3 (citations and internal quotation marks omitted).

judgment is "proper if the party opposing the motion fails to establish an essential element of a claim."[45]

B.  <u>Edison Chouest, Offshore Service, and Galliano are Sutherland's Joint Employers, and Sutherland has a Cause of Action Against All Named Defendants</u>

The "hybrid economic realities/common law control test" is used to establish an employer-employee relationship in the ADA and ADEA context.[46]  The right to control an employee's conduct (i.e. the authority to hire/fire, the right to supervise, and the right to set the employee's work schedule) is the most important component.[47]  The economic realities portion allows courts to consider whether the employer "paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment."[48]  The Fifth Circuit uses a four-factor test to determine if multiple employers are liable as a joint employer, making the employers a single enterprise (i.e. a single employer):  "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."[49]  Courts put the most emphasis on the second factor.[50]

The *Telano* court applied these factors in an ADA context.  While the named defendants were separate limited liability companies, they were both organized in Louisiana, had the same legal address and registered agent, were physically located in the same building, held health insurance meetings in that building, and shared management.[51]  However, the plaintiff's

---

[45] *Id.*

[46] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015); *see also Kendall v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 388 F. Supp. 2d 755, 759 (N.D. Miss. 2005) (applying the test in the ADEA context)

[47] *Id.* (*quoting Deal v. State Farm Cnty. Mut. Ins. Co. of Texas*, 5 F.3d 117, 119 (5th Cir.1993)).

[48]  *Id.*

[49] *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 616–17 (5th Cir. 1999) (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir.1983)).

[50] *Id; see also Telano v. Evans Oil Co., LLC*, No. CV 18-1460, 2019 WL 7190787, at *3 (W.D. La. Dec. 26, 2019) ("[C]ourts have placed the greatest emphasis on the second factor, focusing on which entity made the final decisions regarding employment matters relating to the person claiming discrimination.")

[51] *Telano*, 2019 WL 7190787, at *3.

paycheck and W-2s only identified one of the named defendants as her employer.[52]  Regarding

the centralized control of labor relations, the general manager served in a role for both named

defendants and there was no human resources ("HR") department for the plaintiff's alleged

employer, only an HR department for the other named defendant.[53] Based on the evidence

presented, as applied to the four factors, the court found "a genuine issue of material fact whether

[the named defendants were] an integrated employer for purposes of Telano's Title VII and ADA

claims."[54]

Although Defendants argue Sutherland has no employment relationship with Edison

Chouest or Offshore Service and at all times was only employed by Galliano, there is an obvious

interrelation of operations between Edison Chouest, Offshore Service, and Galliano. It takes but

little research to determine that these entities are related, and Sutherland believed he was

employed by Edison Chouest.[55]  While the true identity of the named defendants is murky, in

general, Edison Chouest is a "trade name/trademark" for Edison Chouest companies, and Edison

Chouest is "more than one company."[56]  Sutherland's employment paperwork comes from both

Edison Chouest and Galliano, showing the interrelationship between these two entities.[57]  A

great dal of the employment-related paperwork given to Sutherland references Edison Chouest,

and most importantly, Edison Chouest wrote to the United States Coast Guard stating that

Sutherland was an employee of Edison Chouest.  His after offer employment report, criminal

record release form, change of address, duties as supervisor, request for employment verification,

United States Coast Guard paperwork, and evaluation forms all include a reference to Edison

---

[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] Sutherland deposition, Exhibit H, pp. 223:8 - 224:10
[56] Austin deposition, Exhibit D, p 22:7-8; Borne deposition, Exhibit B, pp. 9:9 - 10:3
[57] Table analyzing Edison Chouest and Galliano and corresponding paperwork, Exhibit A

Chouest or were sent from an Edison Chouest employee.  Not only does the paperwork overlap, but Edison Chouest and Galliano are at the same location.[58]

The centralized control of labor relations is evidenced by the uniform HR department. As the corporate director of HR, Brett Borne oversees "the human resource functions for Edison Chouest Offshore companies,"[59] is the corporate director of HR for Offshore Service,[60] and is the manager of "Edison Chouest Offshore Benefits Department."[61]   Gina Cheramie/Pitre is the benefits director of Galliano, as well as the benefits director of Edison Chouest Offshore Companies.[62]  In her email signature, her title is "Benefits Director, Edison Chouest Offshore," but within the same paperwork with this email signature, she is referred to as the "Benefits Director, Galliano Marine Services."[63]

As for the third and fourth factor: all named Defendants are owned by the same individuals.  In 2006, Edison Chouest became Offshore Service.[64]  Although Edison Chouest changed its name to Offshore Service, Offshore Service has no direct employees.[65]   And, interestingly, the Offshore Service employees are paid through Galliano, despite the fact that Offshore Service has no direct employees.[66]  Regarding the relationship between Offshore Service and Galliano: Offshore Service has common ownership with Galliano.[67]  Offshore Service has the same address, same registered agent, and officers as Galliano.[68]   Galliano is a

---

[58] Borne deposition, Exhibit B, p 78:11-14
[59] *Id.* at pp. 8:24 - 9:3
[60] *Id.* at p. 9:18-21
[61] *Id.* at p. 54:9-13
[62] *Id.* at p. 76:11-20
[63] FMLA email and corresponding attachments, Exhibit C
[64] Austin deposition, Exhibit D, p. 9:12-23; Secretary of State filings, Exhibit E
[65] Austin deposition, Exhibit D, pp. 9:12-23, 12:19-20; Secretary of State filings, Exhibit E
[66] Austin deposition, Exhibit D, p. 12:19-21
[67] *Id.* at p. 9:4-9
[68] Edison Chouest does not have the same address; however, one of the registered agents for Edison Chouest, Dionee Austin, is also the registered agent for both Offshore Service and Galliano. *See* Secretary of State filings, Exhibit E

family-owned company,[69] and the Chouest family makes pay and employment decisions for this company.[70] Dionne Austin serves as the registered agent for all three named defendants and an officer for two of the three named defendants.[71]

In conclusion, Sutherland has presented adequate information to create a genuine issue of material fact that these entities may be held liable as a joint employer.

## C. Parties Not Named in an EEOC Charge, such as Offshore Service, Can Still be Sued Under the ADA and ADEA.

The Fifth Circuit follows the general rule that a plaintiff may only sue parties named in an EEOC charge.[72] However, a key exception to that rule applies when either of the following occur: (1) there is a "clear identity of interests" between the named and unnamed party[73] or (2) the unnamed party has been provided with adequate notice of the charge.[74] Courts consider the following factors for the identity of interests test: (1) ability of complainant to ascertain the unnamed party's role at the time of filing the charge; (2) similarity of interests between the named and unnamed parties, making it unnecessary to include the unnamed party in the EEOC process; (3) actual prejudice to the unnamed party; and (4) whether the unnamed party represented its relationship is to be through the named party.[75] For the notice test, courts look at

---

[69] Austin deposition, Exhibit D, p. 8:1-3

[70] *Id.* at p. 50:2-7 (The Chouest family made the decision that Coast Guard mariners were no longer needed at Topship); Borne deposition, Exhibit B, pp. 44:25 - 45:6

[71] Plaintiff's SCMF, ¶¶ 22-24.

[72] *See, e.g.*, *Way v. Mueller Brass Co.*, 840 F.2d 303, 307 (5th Cir.1988).

[73] *Williams v. MMO Behavioral Health Sys., LLC*, No. CV 16-11650, 2018 WL 5886523, at *10 (E.D. La. Nov. 9, 2018) (quoting *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 481-82 (5th Cir. 2014) ("[A]n EEOC charge against one entity is sufficient to exhaust administrative remedies as to a different unnamed entity if there is a 'clear identity of interest' between the two'")

[74] *Barnes v. Quality Fab & Mech., L.L.C.*, No. CIV.A. 14-2020, 2015 WL 1540404, at *3 (E.D. La. Apr. 7, 2015) (quoting *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 483 (5th Cir.2014)) ("'[A]n unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance.'"); *see also Telano*,, 2019 WL 7190787, at *4 (recognizing the two ways to invoke the exception)

[75] *Williams*, No. CV 16-11650, 2018 WL 5886523, at *10–11 (E.D. La. Nov. 9, 2018)

whether the unnamed party was aware of the conduct addressed during the EEOC process and whether the unnamed party was given an opportunity to resolve the matter.[76]

Similar to the defendants in *Barnes*, in which all defendants were owned and operated by one individual, the named defendants in this matter are all owned by the same family. The *Barnes* plaintiff only filed an EEOC charge against one of the named defendants; however, the owner of all named defendants received notice of that one charge.[77] The court found that the one charge put all defendants on notice of the charge.[78] The court supported this finding by acknowledging that service of the lawsuit "was effected on all three corporate defendant's [sic] at the same address" because the owner and his wife were the named registered agents for all defendants.[79] More so, although only one named defendant had an EEOC charge against them, the other defendants were not "deprived of the opportunity to participate in EEOC proceedings" and experienced no prejudice because the EEOC did not attempt conciliation.[80]

Here, Sutherland filed charges against Edison Chouest, FMS, and Galliano. In applying the identity of interests test, three of the four factors weigh in favor of allowing Sutherland to sue Offshore Service under the ADA or ADEA. First, although Sutherland may have been able to ascertain Offshore Service's role in his employment at the time of filing the charges, Sutherland was more familiar with the roles Galliano and Edison Chouest played in his employment.[81] Specifically, although Edison Chouest became Offshore Service in 2006, Sutherland continued

---

[76] *Simbaki,* 767 F.3d at 483.

[77] No. CIV.A. 14-2020, 2015 WL 1540404, at *1, 3 (E.D. La. Apr. 7, 2015).

[78] *Id.* at *3.

[79] *Id.* at *3, n. 15.

[80] *Id.* at *3.

[81] *See* Section III, B (the interrelationship between Edison Chouest and Galliano is overwhelming); *see also* Sutherland's deposition, Exhibit H, pp. 127:22 - 128:13; 223:8 - 224:10

to receive paperwork and communication from Edison Chouest, not Offshore Service.[82]   That said, Sutherland's ability to ascertain Offshore Service's role at the time of filing the charge was difficult.   Second, it was not necessary to include Offshore Service in the EEOC process because of the similarity of interests between all three named defendants and FMS.   The overlap of registered agents, officers, and domicile address for all three named defendants and FMS shows the similarity of interests.   Not only does Dionne Austin serve as the registered agent for all three named defendants and an officer for two of the three named defendants, but she also serves in these same roles for FMS.[83]   FMS, Galliano, and Offshore Services have the same domicile address.[84]  Also, Galliano employs people who work at FMS,[85] and FMS is owned by Galliano.[86] Like *Barnes*, service of this lawsuit was effected on all named Defendants at the same address.[87] Next, there was no prejudice to Offshore Service because FMS, Edison Chouest, nor Galliano participated in the conciliation or investigation process at the EEOC.   In fact, none of the named defendants were deprived of the opportunity to participate in EEOC proceedings, as the EEOC did not perform an investigation or attempt conciliation in any of the three charges filed by Sutherland. Finally, while Sutherland is not able to point to any representations made by Offshore Service that its relationship is to be through either Galliano or Edison Chouest, considering that in 2006, Edison Chouest became Offshore Service and the totality of the circumstances, there is a clear identity of interest between all named Defendants, and Offshore Service is likely represented through Edison Chouest or Galliano.

---

[82]  Table analyzing Edison Chouest and Galliano and corresponding paperwork, Exhibit A. Of note, Sutherland has no paperwork or communication from Offshore Service

[83]  Plaintiff's Statement Of Contested Material Facts Presenting A Genuine Issue (hereinafter "Plaintiff's SCMF"), filed herewith, ¶¶ 22-25.

[84]  *Id.* at ¶¶ 23-25.

[85]  Austin deposition, Exhibit D, p. 10:9-13; Duet deposition, Exhibit M, p. 8:8-11

[86]  Duet deposition, Exhibit M, p. 8:15-17

[87]  Correspondence with Notice of Lawsuit and Request to Waive Service of Summons mailed to Dionne Austin for all named Defendants, attached hereto as Exhibit EE; see also R. Doc. 3 and 4 (Waiver of Service Returned Executed)

As for the notice test, Offshore Service was aware of the conduct addressed at the EEOC in all three charges. The first two charges, against Edison Chouest and FMS, were signed by Sutherland on November 1, 2018, and notice of the charge was received by Defendants on or around November 15, 2018.[88] At the very least, there is no dispute that at least one named Defendant had actual notice of the EEOC charge. In fact, on November 14, 2018, Brett Borne emailed the EEOC stating "I received an email for a Notice of Charge of Discrimination yesterday for EEOC charge #846-2019-03060."[89] This is the charge number for the charge against FMS.[90] Borne testified that he received email notification of the charge against Edison Chouest and likely received email notification of the charge against Galliano, too.[91] Because all named Defendants are owned by the same individuals and the HR director of the named Defendants received notice of the Edison Chouest, FMS, and Galliano charge, notice of these charges also served as notice to Offshore Service. In turn, Sutherland exhausted his administrative remedies under either test, and Offshore Service can be sued under the ADA and ADEA.

   D.   <u>Not Only Did Notice of the Edison Chouest and FMS Charge Put Galliano on Notice of the Charge, the EEOC Charge Against Galliano was Timely Filed Because the Pre-Charge Inquiry Serves as Sutherland's Charge Against Galliano.</u>

In Louisiana, a plaintiff must file a charge within 300 days after the alleged unlawful employment practice.[92] Therefore, Sutherland had 300 days from the discriminatory act to file a

---

[88] Defendant's Objections and Responses to Plaintiff's First set of Interrogatories and Requests for Production of Documents, Defendant's response to Interrogatory No. 6, attached hereto as Exhibit FF.

[89] EEOC Charge Detail Inquiry for FMS, attached hereto as Exhibit GG, p. 5

[90] Charge of discrimination against FMS, Exhibit CC. Of note, there is conflicting testimony about this charge because Borne testified that he did not get a copy of this charge. *See* Borne deposition, Exhibit B, p. 66:6-20

[91] Borne deposition, Exhibit B, pp. 67:4-14; 69:9-20

[92] 42 U.S.C. § 2000e-5(e)(1).

charge against Galliano.[93]    Rather than explain the multiple discriminatory acts against Sutherland, Defendants simply focus the Court's attention to Sutherland's maritime restriction on January 10, 2018.[94]    Not only is this date important, but as are several other distinct discriminatory acts by Defendants:[95] (1) his restriction from maritime duty on March 8, 2018 after being cleared by a cardiologist; (2) a light duty position with a reduction in pay on March 28, 2018; and (3) his removal from the schedule on September 4, 2018.

To begin, as discussed *supra*, when entities are so related, as is the case here, such that a charge filed against one entity would also put another entity on notice of the charge, then notice to the named party is sufficient for all both entities.[96] Edison Chouest and Galliano are so related that the charges against Edison Chouest and FMS also put Galliano on notice of the charge. Sutherland's charge against Edison Chouest was filed on November 1, 2018.  No matter which of the four aforementioned dates is used for the adverse action against Sutherland, the November 1, 2018 charge against Edison Chouest was timely filed within 300 days of each of these actions.

If the Court finds that the named Defendants are not Sutherland's joint employers or that Galliano was not put on notice via the Edison Chouest or FMS charge, the Galliano charge was timely filed because the pre-charge inquiry serves as Sutherland's charge against Galliano. Courts have held that documents other than a formal charge of discrimination can constitute a "charge."[97]  This merely requires that the document contain all of the "regulatory requirements in

---

[93] To aid the Court in distinguishing between each of these acts and the applicable deadlines for Sutherland to take action, a timeline of the events and corresponding deadlines is attached as Exhibit HH.

[94] R. Doc 60-2, at 14.

[95] R. Doc. 1 ¶¶ 25, 32, 39; Plaintiff incorporated all of these allegations into each cause of action.  *See* R. Doc. 1 ¶¶ 17-20.  The September 4, 2018 date serves as Sutherland's "termination;" however Defendants maintained him as an employee for fear of a retaliation charge.  *See* Borne deposition, Exhibit B, p. 58:1-9; Austin deposition, Exhibit D, pp. 17:20 - 18:1; Sutherland deposition, Exhibit H, p. 168:4-17 (confirming Sutherland has not been terminated)

[96] Section III, C.

[97] *See Becerra v. Ms. Ellie's Kitchen*, No. CIV.A. 11-1833, 2012 WL 5363793, at *4 (E.D. La. Oct. 31, 2012) (citing *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008)) (Finding an intake questionnaire constituted a charge)

29 C.F.R. §§ 1626.6, 1626.8 and it [can] be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee."[98]  The document must (1) be in writing and include the prospective respondent and allege the discriminatory acts; (2) contain the contact information for the charging party and prospective respondent; (3) contain a statement of the facts describing the alleged discriminatory conduct; (4) include the number of employees for the charged employer if known; and (5) contain a statement indicating whether the charging party has initiated proceedings with a state agency.[99]

In *Becerra*, the court found that the plaintiff's intake questionnaire satisfied the regulatory requirements in 29 C.F.R. §§ 1626.6 and 1626.8 because it "identifie[d] plaintiff, his employer, the facts giving rise to the unlawful termination, the number of employees of the employer, and denies that other proceedings involving the alleged unlawful employment practice were commenced before a state agency."[100]

Here, Sutherland's pre-charge inquiry against Galliano satisfies the regulatory requirements in 29 C.F.R. §§ 1626.6 and 1626.8: (1) it was in writing and included Galliano as the prospective respondent, along with the alleged discriminatory acts ("put on light duty and was cleared by my cardiologist to return to full duty;" "was told they had no light duty job"); (2) it contained both Sutherland's and Galliano's contact information; (3) it contained a statement of the facts describing the alleged discriminatory conduct ("Dr. Darrin [sic] Duet thought I had bad heart problems but I was cleared by my dr"); (4) it included the number of Galliano employees ("More than 500"); and (5) it contained a statement indicating Sutherland had not initiated

---

[98] *Id.*  (internal quotations omitted)
[99] 29 C.F.R. §§ 1626.6 and 1626.8
[100] No. CIV.A. 11-1833, 2012 WL 5363793, at *4 (E.D. La. Oct. 31, 2012); *see also Ray v. Dufresne Spencer Grp., LLC*, No. 1:17-CV-71-RP, 2018 WL 356208, at *4 (N.D. Miss. Jan. 10, 2018) (Plaintiff's timely filed intake questionnaire was construed as a charge)

proceedings with a state agency.[101]    Therefore, this pre-charge inquiry should constitute a "charge."

Not only was the Edison Chouest charge timely filed as it applies to the all four discriminatory acts, Sutherland's pre-charge inquiry against Galliano was timely filed as it relates to three of the four discriminatory acts.  Sutherland's restriction on March 8, 2018 after being cleared by a cardiologist required him to file a charge by January 2, 2019, and Sutherland's pre-charge inquiry against Galliano was received by the EEOC on December 20, 2018 (within the 300 day deadline).  Based on Sutherland's light duty position with a reduction in pay on March 28, 2018, he had until January 22, 2019 to file a charge, and his pre-charge inquiry against Galliano was received prior to this date.  Finally, the removal from the schedule on September 4, 2018 required Sutherland to file a charge by July 1, 2019, and again, his pre-charge inquiry against Galliano was received prior to this date.  Should the court decide that Sutherland's pre-charge inquiry does not constitute a charge, the formal charge against Galliano, dated March 6, 2019, was timely filed within 300 days of the discriminatory act on September 4, 2018.

E.    Sutherland's LEDL Claims Were Timely Filed.[102]

LEDL claims have a one year prescriptive period from the day the act of discrimination occurs.[103]    However, the one year period is suspended during the pendency of investigation by

---

[101] Sutherland's Pre-Charge Inquiry against Galliano, Exhibit I.

[102] The statutory bases for the ADA, ADEA, and the LEDL are identical for purposes of the court's analysis, so Sutherland's analysis under the ADA and ADEA should apply to his LEDL claims. *See, e.g.*, *Walton-Lentz v. Innophos, Inc.*, No. CIV.A. 08-601, 2011 WL 721491 (M.D. La. Feb. 22, 2011), *amended*, No. CIV.A. 08-601, 2011 WL 1575610 (M.D. La. Apr. 25, 2011), and *aff'd and remanded*, 476 F. App'x 566 (5th Cir. 2012) (Applying the statutory bases of the ADEA to LEDL claims); *Ortego v. Dep't of Transportation*, No. CV 13-836, 2014 WL 12521695, at *3 (E.D. La. Feb. 18, 2014), *aff'd sub nom. Ortego v. Standige*, 578 F. App'x 414 (5th Cir. 2014) (Applying the statutory bases of the ADA to LEDL claims).

[103] La. R.S. § 23:303(D)

the EEOC.[104]    The suspension shall be no longer than six months and is lifted upon Plaintiff's receipt of the Notice of the Right to Sue from the EEOC.[105] "When prescription is suspended, the time which preceded the suspension is added to the time which follows it."[106]

For example, in *Clark v. Auger Services, Inc.*, the court determined the plaintiff's state law claim was timely when applying the 18-month prescriptive period (consisting of one-year prescriptive period, plus the maximum six-month suspension period).[107] In computing timeliness, the court granted the maximum six-month suspension because the date between the EEOC intake questionnaire and the issuance of the Right to Sue letter was 13 months, and the lawsuit was filed within the 18 month prescription period.[108]

As the evidence demonstrates, Sutherland timely filed his LEDL claims according to the prescription suspension allowed by La. R. S. § 23:303(D).  The EEOC took 28 days to process Sutherland's charge against Edison Chouest and issue his Right to Sue, 14 days to process Sutherland's charge against FMS and issue his Right to Sue, and 82 days to process Sutherland's charge against Galliano and issue his Right to Sue.[109]  Therefore, Sutherland had one year plus 28, 14, or 82 days to timely file his federal complaint, which he did.

---

[104] *Id.*

[105] *Id.*

[106] *O'Neal v. Cargill, Inc.*, 178 F. Supp. 3d 408, 417- 418 (E.D. La. 2016) (quoting *Miller v. Vogel*, 2003 WL 22966361, at *2 n. 3 (E.D. La. Dec. 17, 2003)) (internal quotations omitted); *see also* La. C.C. art. 3472.

[107] *Clark v. Auger Services, Inc.*, No. CV 18-830-JWD-RLB, 2020 WL 1161929 (M.D. La. Mar. 10, 2020).

[108] *See Id.*

[109] Assuming the court uses the date of the pre-charge inquiry as the start of the EEOC investigation.  However, if the court uses the date on the formal charge of discrimination (March 6, 2019), then the pendency of investigation by the EEOC lasted only 6 days.

F.  Plaintiff Can Fulfill an ADA and LEDL Prima Facie Case of Disability
    Discrimination.

The summary judgment standard in an employment discrimination case is premised on a burden-shifting analysis from *McDonnell Douglas Corp. v. Green* and its progeny.[110]  Under the ADA, a "qualified individual" is entitled to recover for disparate treatment or failure to provide a reasonable accommodation. A plaintiff asserting disability-based discrimination under the ADA must establish: "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability."[111]  The proper causation standard under the ADA for the third element is a "motivating factor" test, not "sole causation."[112]  If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate "a legitimate, nondiscriminatory reason for the adverse employment action."[113]  If the employer meets this burden, the burden shifts back to the plaintiff, who must establish that the proffered nondiscriminatory reason was pretext for the employer's discriminatory treatment.[114]

       i. Sutherland was qualified to perform the essential functions of his job and was not a direct threat to himself or his crew.

Sutherland can establish a prima facie case of discrimination under the ADA and LEDL. Defendants do not contest the first or third element of the prima facie case.[115] Therefore, Plaintiff only responds to the second element, and as demonstrated below, Sutherland was qualified to perform the essential functions of his job and was not a direct threat to himself or his crew.

---

[110] 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973)

[111] *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (quoting *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)).

[112] *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008).

[113] *Caldwell*, 850 F.3d at 241–42 (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016) (internal quotes omitted).

[114] *Id.* at 242.

[115] R. Doc. 60-2 at 16-17; *See Nall v. BNSF Ry. Co.*, 917 F.3d 335, 350 (5th Cir. 2019) (Costa, G. concurring) ("An employer cannot have it both ways by arguing that the termination was justified because the disability was dangerous while also maintaining that the safety-threatening disability was not the reason for the firing. When a concern about the disability's negative impact on workplace safety is the reason for the adverse action, the 'causation' element of an ADA discrimination claim should be straightforward.")

A plaintiff can fulfill the second element of the prima facie case and establish that he is a "qualified individual" by showing: (1) "he could perform the essential functions of the job in spite of his disability;" or (2) "a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job."[116] "Essential functions" are fundamental, as opposed to marginal, job duties of the position held by the individual.[117] Deference is given to an employer's judgment as to what functions are essential.[118] Evidence of an essential function may include the employer's judgment, written job descriptions, "[t]he amount of time spent on the job performing the function," "the consequences of not requiring the employee to perform the function," and/or work experience of employees in similar positions.[119]

Determining if an employee is qualified for his position is directly related to the question of whether an employer is entitled to a "direct threat" defense.[120] When analyzing a direct threat defense, courts must look to "'the objective reasonableness of [the employer's] actions.'"[121] An individualized assessment of the employee's ability to safely perform the essential job functions is required,[122] and an employer cannot reach a "categorical conclusion that an employee with a particular disability cannot safely perform a job."[123]

At the summary judgment stage, "the question is whether there is any evidence in the record that creates a genuine issue of material fact as to whether [an employer] meaningfully assessed [the plaintiff's] ability to perform his job safely and reasonably concluded that he posed

---

[116] *Moss*, 851 F.3d at 417 (quoting *LHC Grp.*, 773 F.3d at 697) (internal quotes omitted); *see e.g.*, *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir.1996)

[117] 29 C.F.R. § 1630.2(n).

[118] 42 U.S.C. § 12111(8); *Credeur v. La. through Office of Atty. Gen.*, 860 F.3d 785, 792 (5th Cir. 2017).

[119] 29 C.F.R. § 1630.2(n)(3).

[120] *See Nall*, 917 F.3d at 342.

[121] *Id.* at 342 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 650, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998))

[122] *See Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) ("The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job.'" (quoting 29 C.F.R. § 1630.2(r))

[123] *Nall*, 917 F.3d at 344.

a direct threat."[124] Courts must look to what tasks a plaintiff allegedly cannot perform safely.[125] While an employer can choose to disregard medical releases based on "a limited set of observations and incomplete set of facts" and credit the opinions of its own doctors, an employer is still required to show "objective reasonableness of those opinions."[126]

        For example, in *Nall*, despite the plaintiff's neurologist release to full duty based on a medical form provided by the employer, the employer placed the plaintiff on medical leave.[127] After the release from the neurologist, the employer's doctor revised the form to include additional duties associated with the plaintiff's job.[128] The court first considered the essential job functions based on the first job description and then considered the employer's reasonableness in its determination that the plaintiff "could not safely perform these tasks."[129]  Because all of Nall's doctor's concluded he could safely perform the tasks listed on the job description, Nall successfully completed a field test, and considering the comments made by defendant employees regarding Nall's disability, the court found a genuine issue of material fact "as to whether [the employer] meaningfully assessed Nall's ability to perform his job safely and reasonably concluded that he posed a direct threat."[130]   Considering this evidence, the court further articulated that there was a factual dispute regarding "whether [the employer] requested particular objective evidence of Nall's ability to perform his job, only to intentionally disregard that evidence when it indicated that Nall was qualified and instead request new evidence on

---

[124] *Id.*
[125] *Id.* at 343
[126] *Id.* at 345 (internal quotations omitted).
[127] *Id.* at 338
[128] *Id.*; *see also id.* at 343 (The court noted that although the written job descriptions contained differences, this did not affect the plaintiff's qualifications because employers generally require, as an essential job function, that employees perform job tasks safely.)
[129] *Id.* at 344
[130] *Id.*; *see also id.* at 346 (noting "a genuine dispute as to the objective reasonableness of [the employer's] actions.")

which to base its direct threat determination."[131]    To conclude, the court determined that a reasonable jury could conclude that the employer did not consider the "best available objective evidence" or engage in an individualized assessment of the plaintiff's ability to perform the essential duties of his position, and "as a result, [the employer's] direct threat determination was not objectively reasonable."[132]

In the same manner, Defendants' direct threat determination was not objectively reasonable because Defendants did not consider the best available objective evidence or engage in an individualized assessment of Sutherland.  Defendants allege Sutherland cannot perform the safe operation of the vessel, an essential function of a Master.    To begin, Sutherland's qualification should not be affected because all employers generally require, as an essential job function, that employees perform job tasks safely.  Importantly, compliance with the Manual and the Guidelines, which Dr. Duet uses to determine if an individual is fit for maritime service, is not an essential job function according to the Master job description.[133]    Nevertheless, Dr. Duet required compliance with these standards prior to releasing Sutherland to full duty.[134] Specifically, he required Sutherland to complete a stress test, and although a cardiologist released Sutherland to full duty based on the stress test results, Dr. Duet maintained Sutherland's restriction from maritime service.[135]

Dr. Duet selected specific portions of these standards and applied them to Sutherland although the standards are not an essential job function.  For example, the Manual states that someone with a *previous* diagnosis of coronary artery disease may require further review, not

---

[131] *Id.* at 346-347

[132] *Id.* at 343

[133] Duet declaration, Exhibit R, at ¶ 4; Merchant Mariner Medical Manual, Exhibit O; Guidelines on the Medical Examinations of Seafarers, Exhibit P; Master job description, Exhibit S.

[134] Duet declaration, Exhibit R, at ¶ 4.

[135] Post Incident/Tracking Record dated March 9, 2018, Exhibit F; Duet declaration, Exhibit R, at ¶6.

someone who *may* have coronary artery disease.[136]  Sutherland did not have a previous diagnosis of coronary artery disease; therefore, applying this standard to Sutherland was not appropriate. Yet, Dr. Duet then applied the treadmill stress test standard to Sutherland, which required "at least 7.5 minutes of exercise, 8 metabolic equivalents (METS) of work, and 85% of maximum predicted heart rate."[137]  Not only should this stress test standard not have applied to Sutherland, but this form of testing is only a preference/recommendation according to the Manual, not a requirement.[138]  What is more important is that the Manual states, "[g]enerally, the type and manner of evaluation data or **objective** testing submitted will be left to the discretion of the treating provider or specialist"[139]  Dr. Duet completely disregarded this portion of the Manual, as he did not leave the objective testing to the discretion of the treating specialist, Dr. Eilen. Rather, Dr. Duet took it upon himself to interpret the test results and restrict Sutherland from maritime duties.  Of note, Dr. Duet is not "required to have any specific certification in order to certify a mariner for fit for duty"[140] and he is simply trained through "courses, continuing medical education, [and] mentorship" as it relates to "focus medical exam[s]."[141]

More so, according to the Guidelines, when an individual does not have a defined impairment or a diagnosed medical condition that reduces the ability to perform emergency duties essential to the safe operation of the vessel, then that individual should be able to complete escaping, fire fighting and evacuation—all important safety functions.[142]  Sutherland was not diagnosed with coronary artery disease (i.e. he does not have a defined impairment or a diagnosed medical condition, which reduces his ability to perform emergency duties), which

---

[136] Duet deposition, Exhibit M, p. 40:1-7;  Merchant Mariner Medical Manual, Exhibit O, at 12-1.
[137] Merchant Mariner Medical Manual, Exhibit O, at 12-7.
[138] *Id.*
[139] *Id.* at 12-3 (emphasis added)
[140] Duet deposition, Exhibit M, pp. 19:19 - 20:1
[141] *Id.* at p.25:3-10
[142] *Id.* at p. 50:4-11; Guidelines on the Medical Examinations of Seafarers, Exhibit P, p. 28

means that Sutherland should be able to complete all of the duties essential to the safe operation of the vessel.[143]  But, it was never determined if Sutherland could in fact safely perform these tasks.[144]  The guide also states that if an individual has the ability to "don lifejacket or immersion suit; crawl; feel for difference in temperature;  handle fire-fighting  equipment; [and] wear breathing apparatus," then that individual should be able to perform the emergency duties on board.[145]  Again, Sutherland had the ability to perform these duties, as required of a Master, yet Dr. Duet restricted Sutherland from maritime service without evaluating whether Sutherland could safely perform these duties.

While Defendants can choose to disregard Dr. Eilen's medical release because Dr. Eilen did not have a full job description, because he was not aware of specifics what would be expected of Sutherland in the event of an emergency, or because he was not familiar with the federal guidelines regarding mariners' physical fitness standards, Defendants are required to show reasonableness of Dr. Duet's opinions.  Simply because Galliano issues Dr. Duet's paychecks,[146] Defendants cannot solely rely on his opinion, and unfortunately, Defendants are unable to show their reliance on Dr. Duet's opinion was reasonable.

When a physician does not base his assessment on an individualized basis, the assessment cannot be credited.[147]  Employers cannot rely on perceptions of a disability based on a stereotype; they must evaluate employees based on his actual state.[148]  Employers must focus on whether a particular employee is actually capable of performing the essential functions of the job

---

[143] Sutherland deposition, Exhibit H, p.224:11-13 (Sutherland has never been diagnosed with coronary artery disease)

[144] Plaintiff argues that if required, he could complete all of the duties essential to the safe operation of the vessel. *See* Sutherland deposition, Exhibit H, p.224:14-21.

[145] Guidelines on the Medical Examinations of Seafarers, Exhibit P, p. 28; Duet deposition, Exhibit M, p. 51:14-21.

[146] Duet deposition, exhibit M, p. 8:8-11

[147] *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 476 (5th Cir. 2006).

[148] *Id.* at 475.

at issue.   Any hypothetical risks posed by someone with a disability or perceived disability is not a legitimate grounds to make an employment decision.[149]   An employer cannot escape the obligation to evaluate an individual by blindly relying on a doctor's opinion.[150]   A medical opinion can be evidence of non discriminatory intent, but importantly, obtaining an opinion does not automatically absolve the employer from liability.[151]   Finally, an employer cannot escape legal obligations by contracting out personnel functions to third parties.

Here, Dr. Duet's assessment cannot be credited because it was not based on an individualized basis.   In fact, Dr. Duet's assessment was based on inappropriately applied standards and generalized data, not Sutherland's actual state, which resulted in an incorrect conclusion that Sutherland *might* have coronary artery disease.   Interestingly, Dr. Duet does not ask the individuals he is evaluating, including Sutherland, if they are required to do physical demands listed within the Master job description; instead, Dr. Duet relies on the general job description provided to him.[152]   Defendants' reliance on Dr. Duet's assessment ultimately resulted in Defendants stereotyping a perceived disability.   Neither Defendants nor Dr. Duet knew if Sutherland was actually capable of performing the essential functions of the job.[153] Unlike *Nall*, the Defendants here never required Sutherland to complete a field test to determine whether Sutherland could perform his job safely or posed a direct threat. Dr. Duet refused to consider the evaluation and recommendation by Sutherland's cardiologist to allow Sutherland to return to work, which Dr. Duet himself required Sutherland to obtain. Instead of determining if Sutherland could meet the Coast Guard's minimum fitness requirements (which is not an

---

[149] *Id.* at 483.
[150] *See Id.* at 484.
[151] *Id.*
[152] Duet deposition, Exhibit M, pp. 63:2 - 64:8
[153] *Id.* at p. 64:9-14 (Dr. Duet never asked Sutherland if he was able to perform any or all of the physical demands listed within the Master job description)

essential function) and that Sutherland's physical health did not pose a safety risk to himself or others by performing a further evaluation, Dr. Duet articulated that the treadmill stress test performed with Dr. Eilen "confirmed [Dr. Duet's] suspicions or concerns for coronary artery disease, which lead to [Sutherland's] restriction for maritime service."[154]  It is unclear how Dr. Duet's suspicions were confirmed when a cardiologist specifically confirmed Sutherland did not have coronary artery disease.[155]

Like the *Nall* plaintiff, Sutherland's cardiologist released him to full duty with no restrictions based on the stress test.  The hypothetical risks Dr. Duet believed Sutherland posed are not a legitimate grounds to make an employment decision, and Defendants cannot escape the obligation to evaluate Sutherland by blindly relying on Dr. Duet's opinion.  Specifically, Defendants did not consider Dr. Eilen's release[156] and relied solely on Dr. Duet's improper assessment when placing Sutherland in a Mate (light duty) position refusing to schedule Sutherland for maritime service until Dr. Duet deemed Sutherland fit for maritime duty.[157] Considering the essential job functions of a Master, the Defendants' determination that Sutherland could not safely perform these tasks was not objectively reasonable.

Dr. Duet asserts he was concerned with the non-diagnostic stress test; however, Sutherland's stress test was read as non-diagnostic based on the possibility that if Sutherland had walked for longer "maybe something else would have shown up."[158]  Importantly, the stress test should not be taken by itself.[159]  While Dr. Duet believes the non-diagnostic was significant, Dr.

---

[154] *Id.* at pp. 116:25 - 117:8
[155] Eilen deposition, Exhibit N, p. 50:6-19;  Sutherland Return to Work Order, Exhibit T
[156] Sutherland deposition, Exhibit H, pp. 136:15 - 137:8 (Not only did Defendants fail to gather more information from Dr. Duet based on his evaluation, but Sutherland also attempted to contact Defendants numerous times to provide his release from Dr. Eilen to no avail.)
[157] Declaration of Dionne Chouest Austin, attached hereto as Exhibit II, ¶ 3
[158] Eilen deposition, Exhibit N, p. 26:10-24
[159] *Id.* at p. 32:15-24

Eilen disagrees. Specifically, Dr. Elien suggested that another test should have been completed, and noted that Sutherland's legs were the reason Sutherland stopped the test.[160] Dr. Eilen also suggested that Dr. Duet should have communicated with Dr. Eilen to provide him with additional information that would have allowed Sutherland to return to work because Sutherland did not have chest pain.[161]

The evidence presented creates a genuine issue of material fact as to whether Defendants meaningfully assessed Sutherland's ability to perform his job safely and whether Defendants reasonably concluded that he posed a direct threat. Specifically, Defendants do not clearly state which tasks Sutherland allegedly could not perform safely; Defendants did not properly determine that Sutherland posed a direct threat, as their actions were not objectively reasonable; and Defendants did not perform an individualized assessment of Sutherland's ability to safely perform the essential job functions.

> ii. Defendants' legitimate, non-discriminatory reason was pretext for discrimination.

Although Defendants do not specifically articulate a legitimate, non-discriminatory reason for the adverse actions against Sutherland, plaintiff will assume (and adamantly deny) that the safety concerns and/or the stacking of vessels constitute a legitimate, non-discriminatory reason for the multiple adverse actions. Yet, these safety concerns were not tied to Sutherland's ability to perform the tasks required of his job because he could perform all of the tasks. Instead, Defendants' concerns were tied to Sutherland's physical impairment, which is discriminatory.[162]

---

[160] *Id.* at pp. 42:9-44:18

[161] *Id.*

[162] *See Nall*, 917 F.3d at 348 (viewing in the light most favorable to the plaintiff, defendant's concerns were tied to plaintiff's Parkinson's symptoms); *Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209, 221 (5th Cir. 2000) (en banc) (Jones, J., and Smith, J., dissenting) ("[W]e may have special cause for suspicion when an employer justifies discrimination not on the relatively concrete and more readily measurable basis of ability to perform a particular essential job function safely, but because of a proffered generalized concern about health and safety.").

Not only can Sutherland prove pretext by showing that Defendants' concerns were tied to Sutherland's physical impairment, but Defendants' have also presented conflicting information regarding Sutherland's Family and Medical Leave Act ("FMLA") and his "termination."[163]  For example, Defendants mailed a letter to Sutherland regarding FMLA leave, which was dated November 7, 2018 and refers to his potential termination on that same date; however, the letter was not postmarked until November 9, 2018.[164]  So, two days after Defendants allege Sutherland will be terminated, Defendants mailed a letter to Sutherland informing him of this decision. The timing of the notice is indicative of Defendants attempt to have some sort of legitimate reason for Sutherland's termination.  Interestingly though, Sutherland never invoked his FMLA leave right;[165] instead, Defendants took it upon themselves to invoke Sutherland's FMLA rights without his request and in order to ensure their discriminatory actions did not appear so.[166] Although Defendants assert there were other documents sent regarding FMLA leave, Sutherland only received the November 7, 2018 letter.[167]  As for the stacking of vessels, this reason is also unworthy of credence.  After Sutherland's last day of work at Topship, Sutherland received an offer from Defendants for an instructor job in October of 2018, which shows that Defendants were still employing individuals at Topship after September of 2018.[168] Finally, rather than terminate Sutherland, Defendants chose to keep him as an employee and not terminate him for fear of retaliation.[169]

---

[163] *See Caldwell v. KHOU-TV,* 850 F.3d 237, 241 (5th Cir. 2017) (Pretext can be shown "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.")
[164] FMLA correspondence from Defendants dated November 7, 2018, attached hereto as Exhibit JJ.
[165] Borne deposition, Exhibit B, p. 63:9-12; *see also* Correspondence from Sutherland to Defendants dated November 15, 2018, attached hereto as Exhibit KK
[166] Borne deposition, Exhibit B, pp. 81:15 - 82:4
[167] Sutherland deposition, Exhibit H, p. 178:13 - 16
[168] *Id.* at pp.181:2 - 182:11; *see also* Correspondence from Sutherland to Defendants, Exhibit KK
[169] Borne deposition, Exhibit B, p. 58:1-9; Austin deposition, Exhibit D, pp. 17:20 - 18:1; *see also* Sutherland deposition, Exhibit H, p. 168:4-17 (confirming Sutherland has not been terminated)

Sutherland has established a prima facie case of discrimination; therefore, that, combined with evidence that Defendants' concerns were tied to Sutherland's physical impairment and Defendants' asserted justification for "termination" is false, should lead this court to conclude that Defendants unlawfully discriminated against Sutherland.

G.  Plaintiff Can Fulfill an ADEA and LEDL Prima Facie Case of Age Discrimination.[170]

Like plaintiff's ADA claims, plaintiff's ADEA claims are also premised on the burden-shifting analysis from *McDonnell Douglas*.  The prima facie case for disparate treatment based on age requires the plaintiff to show "(1) he was at least forty years of age, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age."[171]  "[A] plaintiff may prove that age was a but-for cause of his firing with direct or indirect evidence."[172] Defendants argue Sutherland cannot meet the second or forth prongs of this prima facie case of age discrimination, but Sutherland was qualified for his light duty position and Sutherland has produced both direct and indirect evidence proving his age was a but-for cause of his termination.

As discussed, Sutherland was qualified for his position as a Master, but Dr. Duet incorrectly restricted his abilities.[173] However, if the court finds that Sutherland was not qualified for his position as Master, at the time of his "termination," his assignment was a light duty position of Mate, which he was qualified to perform. The Defendants argument for the second element is premised on Sutherland's qualifications for his position as a Master, yet he had not worked in that position since January 10, 2018.

---

[170] Plaintiff's pretext analysis also applies to Plaintiff's ADEA claims, as the same burden shifting analysis applies.
[171] *Hardy v. Shell Chem. Co.*, 693 F. Supp. 2d 611, 618 (E.D. La. 2010).
[172] *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447 (5th Cir. 2019) (citing *Kilgore v. Brookeland Indep. Sch. Dist.*, 538 F. App'x 473, 475-76 (5th Cir. 2013) (per curiam) (unpublished))
[173] Section III, F, i

For the fourth element, remarks may used to show an employee was otherwise discharged because of age and thus defeat summary judgment if they are tied to the adverse employment action in terms of timing and who made the comments.[174] The *CSC Logic* test requires any ageist remark be proximate in time to the termination, made by an individual with authority over the employment decision, and related to the challenged decision.[175] If remarks are offered as evidence of discrimination under the *McDonnell Douglas* framework, a more flexible two-part test can be applied.[176] In order for remarks to be circumstantial evidence, they must "demonstrate a discriminatory animus; and be made by a person who has leverage over the decision maker, or is otherwise in a position to influence, the challenged decision."[177]

For example, in *Machinchick v. PB Power, Inc.*, the court found "age stereotyping remarks" made by a terminating supervisor regarding the terminated employee as evidence of an inference of age discrimination adequate to establish a prima facie case.[178] In an email describing the plaintiff's shortcomings, the supervisor stated he was "not adaptable," "inflexible," and possessed a "business-as-usual attitude."[179] The court determined these subtle remarks in the email, and confirmed in the deposition, gave rise to an inference that the employer terminated the plaintiff for age reasons.[180] These remarks, though subtle, discriminated against the employee due to his age.[181]

---

[174] *See Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015) (citing *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 389 (5th Cir. 2010)).

[175] *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996).

[176] *Suggs v. Central Oil of Baton Rouge, LLC.*, No. CIV.A. 13-25-RLB, 2014 WL 3037213 (M.D. La. July 3, 2014) (citing *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012)).

[177] *Suggs v. Central Oil of Baton Rouge, LLC.*, No. CIV.A. 13-25-RLB, 2014 WL 3037213 (M.D. La. July 3, 2014) (citing *Palasota v. Haggar Clothing*, 342 F.3d 569, 578 (5th Cir. 2003) (crediting comments from non-decisionmakers who were "in a position to influence the decision").

[178] 398 F.3d 345, 353 (5th Cir. 2005).

[179] *Id.* at 350.

[180] *See id.*

[181] *See id.*

More specifically, in *Palasota v. Haggar Clothing*, the court applied the more flexible two-part standard.[182] The court found that remarks from the company's president such as "graying of the sales force" and that he wanted "race horses and not plow horses" demonstrated a discriminatory animus.[183] Further, the president was not directly in charge of making the ultimate decision to terminate the plaintiff, but served as a positive influence over the decision maker.[184] Therefore, the court determined this was sufficient to establish a prima facie case for age discrimination.[185]

Similarly, Defendants' company doctor, Dr. Duet, made a discriminatory remark comparable to the statements made by the president of the defendant company in *Palasota*. Dr. Duet, employed to ensure employees are in fit for maritime duty, has influence over the company's decision makers and in their hiring or firing. In fact, Dr. Duet's paycheck is issued by Galliano. Therefore, when Dr. Duet made the discriminatory remark that Sutherland was a "ticking time bomb,"[186] this influenced the maritime restrictions and "termination" decision. This clearly meets the fourth prong to establish a prima facie case and defeat summary judgment.

Additionally, Defendants provided information to Metlife, and Metlife used that information to reference Sutherland's age.[187] Specifically, Sutherland's statement from Metlife states "old age."[188] However, FICA (Federal Insurance Contributions Act) taxes apply to Social Security and Medicare. The Social Security portion refers to Old-Age, Survivors and Disability Insurance (OASDI), and instead of simply refer to Social Security, or even disability, it was

---

[182] 342 F.3d 569, 578 (5th Cir. 2003).
[183] *Id.*
[184] *See Id.*
[185] *See Id. See also Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988) (remarks that had the effect of age discrimination were sufficient evidence to defeat summary judgment and establish a prima facie case for age discrimination)
[186] Duet deposition, Exhibit M, p. 118:5-18
[187] Austin deposition, Exhibit D, pp. 57:24 - 59:4
[188] Metlife Explanation of Benefits, attached hereto as Exhibit LL

relayed to Metlife that the FICA taxes apply to "old age."  What is interesting is that Sutherland received this Metlife check because of his "disability," and despite that, "old age" was placed on his paycheck.   Sutherland's "disability" can present itself at any age and was in no way connected to his age. Therefore, it is clear that Sutherland meets all the elements of a prima facie case for age discrimination.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

SANGISETTY LAW FIRM

_s/ Whitney Wilson_____
**WHITNEY WILSON (#38447)**
**RAVI SANGISETTY (#30709)**
3914 Canal Street
New Orleans, LA 70119
Telephone:     (504) 662-1016
Facsimile:     (504) 662-1318
whitney@sangiettylaw.com
rks@sangisettylaw.com