UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROGER SUTHERLAND                                    CIVIL ACTION

VERSUS                                                    NO. 19-414

EDISON CHOUEST OFFSHORE,                    SECTION "R" (1)
INC., ET AL.


## ORDER AND REASONS

Before the Court is defendants Edison Chouest Offshore., Inc.,
Offshore Service Vessels, L.L.C., and Galliano Marine Service, L.L.C.'s
motion for summary judgment.[1]  Because there is no genuine dispute as to
any material fact, and because defendants are entitled to a judgment as a
matter of law, the Court grants defendants' motion.


## I.    BACKGROUND

Plaintiff, Roger Sutherland, brings claims of discrimination under the
Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.; the Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 631, *et seq*.; and
the Louisiana Employment Discrimination Law ("LEDL"), La. R.S. § 23:301,

---

[1]     R. Doc. 60.

*et seq.* Sutherland brought this suit against Edison Chouest Offshore, Inc. ("Edison Chouest"), Offshore Service Vessels, L.L.C. ("Offshore Service"), and Galliano Marine Service, L.L.C. ("Galliano") under the theory that they were his "joint employer."[2]

Sutherland was 69 years old when the events at issue occurred[3] and 70 when he filed the complaint in this case.[4]  He began working for defendants as a deckhand on February 17, 1998.[5]  By April 25, 2012, Sutherland had been promoted to the position of master captain.[6]

On November 14, 2017, pursuant to defendants' Drug and Alcohol Procedure, plaintiff reported[7] taking clonidine, a "sedating blood pressure medication," which is, according to the procedure, "incompatible with safety-sensitive duties."[8]  This triggered defendants' reporting protocols and Sutherland was referred to Family Medical Services ("FMS") for further evaluation.[9]

---

[2]   R. Doc. 1 at 2, ¶ 9.
[3]   R. Doc. 70-5 at 1 (Cardiology Clinic Note).
[4]   *Id.* at 6, ¶ 34.
[5]   R. Doc. 60-2 at 2.
[6]   *Id.*
[7]   R. Doc. 70-4 at 87 (Medication Reporting Form).
[8]   R. Do. 70-4 at 86 (Drug and Alcohol Procedure).
[9]   *Id.* at 85.

On January 10, 2018, Sutherland underwent an evaluation at FMS.[10]

Medical records from the evaluation list several medications Sutherland was

taking for high blood pressure[11] and six blood pressure readings.[12]   Dr.

Darren Duet, who performed the evaluation, noted an "abnormal EKG" and

"irregular [heart] rhythm."[13]   According to Dr. Duet, these diagnoses and

high blood pressure are among several risk factors for coronary artery

disease.[14]   In addition, Sutherland smokes about a "pack a day,"[15] and "is

absolutely against stopping smoking."[16]   After the evaluation on January 10,

Dr. Duet restricted Sutherland from maritime duty pending further

---

[10]    R. Doc. 70-4 at 88 (FMS Medical Evaluation).

[11]    *Id.*  The evaluation shows that Sutherland's medications included
Dystolic, Amlodipine, which replaced Clonidine, and Losartan.  *Id.*  The
patient notes reflect that Sutherland last took Clonidine in December 2017.
R. Doc. 60-4 at 30 (Communication Log/Progress Notes); R. Doc. 70-4 at
90 (Letter from Dr. Miley).

[12]    R. Doc. 70-4 at 88 (FMS Medical Evaluation).  The six blood pressure
readings are 160/82, 157/71, 180/94, 198/112, 150/64, and 162/71.

[13]    R. Doc. 70-4 at 91 (Pending Medical Records Form).  A different form,
also dated January 10, 2018, described Sutherland's diagnoses as
"hypertension" and "abnormal EKG." R. Doc. 70-4 at 92 (FMS Post
Incident/Tracking Record).

[14]    R. Doc. 70-3 at 57 (Duet Deposition at 28:13-18) (listing abnormal
EKG, elevated blood pressure, heart rate, changes in vital signs, symptoms,
being a man, and abnormal vital signs as "risk factors" for coronary artery
disease); R. Doc. 60-3 at 49 (Duet Deposition at 34:17-20) (also listing age
and smoking).

[15]    R. Doc. 60-3 at 52 (Sutherland Deposition at 13:12-13).

[16]    R. Doc. 70-5 at 3 (Cardiology Clinic Note).  This note was made by Dr.
Steven Eilen on March 8, 2018, after the January 10 evaluation.

evaluation.    Galliano effectuated Dr. Duet's restriction by scheduling Sutherland in a position involving non-maritime duty.[17]

Dr. Duet referred Sutherland to a cardiologist, Dr. Steven Eilen.  Dr. Duet "required [Sutherland] to undergo a cardiac exercise stress test using the Standard Bruce Protocol and quantification of maximum exercise tolerance to ensure he was medically fit for duty and could comply with" applicable U.S. Coast Guard guidelines.[18] According to Dr. Duet, "an exercise stress test or equivalent" is the only way to diagnose a patient with coronary artery disease.[19] The U.S. Coast Guard's Merchant Mariner Medical Manual ("Manual") sets out the appropriate standards: to evaluate an individual for coronary artery disease, the person should complete a treadmill stress test "to at least 7.5 minutes of exercise, 8 metabolic equivalents (METS) of work, and 85% of maximum predicted heart rate."[20]

Sutherland took a treadmill stress test on February 21, 2018, but did not achieve the levels set out in the Manual.[21]    After four minutes and twenty-two seconds, Sutherland "reported fatigue and leg pain which

---

[17]    R. Doc. 70-5 at 48, ¶ 3 (Declaration of Dionne Chouest Austin).
[18]    R. Doc. 70-4 at 67, ¶ 5 (Declaration of Dr. Darren Duet)
[19]    R. Doc. 60-3 at 50 (Duet Deposition at 43:17-44:6).
[20]    R. Doc. 70-4 at 29.
[21]    R. Doc. 70-4 at 62 (Stress Test Results).

resulted in termination of the [stress test]."[22]  He reached 80% of his age-predicted maximum heart rate and 7 METS.[23]  The test was ruled "non-diagnostic" because Sutherland did not reach 85% of his age-predicted maximum heart rate.[24]

On March 8, 2018, Dr. Eilen examined Sutherland and released him to return to work with no restrictions, even though Sutherland did not complete a diagnostic stress test. [25]  Dr. Eilen explained in his deposition that a non-diagnostic result means that Sutherland "didn't have a problem" at the achieved workload, but if Sutherland had lasted longer, "maybe something else would have shown up."[26]

The next day, March 9, 2018, Dr. Duet reviewed the results of the stress test and Dr. Eilen's release.[27]  Dr. Duet stated that because he could not rule out that Sutherland had obstructive coronary artery disease, which would preclude his being fit for duty, and because he could not meet the minimum fitness standards for a mariner's position, he maintained Sutherland's

---

22    *Id.*
23    *Id.*
24    R. Doc. 70-4 at 5 (Eilen Deposition at 26:14-24).
25    R. Doc. 70-5 at 7 (Cardiology Clinic Note); R. Doc. 70-4 at 74 (Return to Work Form).
26    R. Doc. 70-4 at 5 (Eilen Deposition at 26:14-24).
27    R. Doc. 70-4 at 67 (Declaration of Dr. Darren Duet).

restriction from maritime service and limited him to light duty.[28]  In light of Dr. Duet's limitation, Galliano told Sutherland that he would remain on light duty until he "was able to demonstrate his fitness for duty and ability to meet the U.S. Coast Guard's minimum fitness requirements."[29]  There is no evidence that Sutherland ever attempted to demonstrate his fitness by completing a diagnostic stress test.

Following Dr. Duet's determination, Sutherland received light-duty work assignments as a mate at the Topship shipyard starting on March 28, 2018.[30]  According to Sutherland, his new assignments came with  a reduction in pay from a day rate of $675 to $400 per day.[31]  Sutherland stated that his last day at Topship was September 4, 2018 and alleges that Brett Borne, the corporate director of human resources for Galliano,[32] "terminated" him by informing him that light-duty positions were no longer available.[33]  Defendants submitted evidence that worsening economic conditions made it impracticable to continue to pay day rates to their

---

[28]   *Id.*

[29]   *Id.*; R. Doc. 70-5 at 48, ¶ 3 (Declaration of Dionne Chouest Austin).

[30]   *See* R. Doc. 70-3 at 26 (Employment Logs).

[31]   R. Doc. 70 at 5 n. 34; R. Doc. 70-3 at 30-31 (Sutherland Deposition at 129:25-130:14).

[32]   R. Doc. 70-2 at 41-42 (Borne Deposition at 8:21-9:3).

[33]   R. Doc. 70-3 at 35 (Sutherland Deposition at 158:1-6); R. Doc. 70-5 at 14 (EEOC Charge Against Edison Chouest).

6

shipyard workers, like Sutherland, who were restricted from maritime service.[34]

Defendants state that they told Sutherland that he could continue working but would receive an hourly rate and would no longer receive housing or meals.[35]  According to Dionne Chouest Austin, who serves as general counsel for "Edison Chouest Offshore [c]ompanies ("ECO") and, as such, serve[s] as general counsel for Galliano,"[36] Sutherland refused this arrangement.[37]

Sutherland admits that he was later offered a light-duty position at Topship at an hourly rate.[38]  He considered the offer unreasonable because the job required a commute of 116 miles and did not include housing.[39] Nevertheless, plaintiff stated that he never refused the offer and would have accepted it at a higher pay-rate than had been offered.

---

[34]     R. Doc. 60-2 at 8; R. Doc. 70-5 at 49, ¶ 10 (Dionne Chouest Austin Declaration).

[35]     R. Doc. 60-2 at 8-9.

[36]     R. Doc. 70-5 at 48, ¶ 2 (Dionne Chouest Austin Declaration)

[37]     *Id.* at 49, ¶ 10.

[38]     R. Doc. 70-3 at 38 (Sutherland Deposition at 181:2-182:11).

[39]     *Id.* at 39 (Sutherland Deposition at 182:1-4).  Sutherland describes the mileage as both 116 and 119 miles at different times in his deposition.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

8

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322 (emphasis added))).

## III.   DISCUSSION

Defendant moves for summary judgment on plaintiff's claims for disability discrimination under the ADA, age discrimination under the ADEA, and parallel disability and age discrimination claims under the LEDL.

### A.   **Jurisdictional Prerequisites**

The defendants first contend that the Court should not reach the merits of plaintiff's federal claims for two reasons: first, of the three named defendants, only Galliano was plaintiff's actual employer; and second, plaintiff failed to exhaust his administrative remedies by timely bringing EEOC charges against Galliano and Offshore Service.

#### 1.   *Employer-Employee Relationship*

As previously noted, plaintiff brought this suit against Edison Chouest Offshore., Inc., Offshore Service Vessels, L.L.C., and Galliano Marine Service, L.L.C.  In 1996, Edison Chouest, Inc. merged with Edison Chouest,

L.L.C., with the L.L.C. as the surviving entity.[40]  In 2006, Edison Chouest,

L.L.C. changed its name to Offshore Service Vessels, L.L.C.[41]   "Edison

Chouest Offshore" continues to exist as a "tradename" for Edison Chouest

Offshore companies.[42]  The Court refers to the group of companies that goes

under the tradename, Edison Chouest Offshore, as "ECO" and the now-

dissolved defendant entity, Edison Chouest Offshore, Inc. as "Edison

Chouest."   Offshore Service, the entity that survived the merger and

underwent a name change, owns vessels.  Galliano is a payroll company for

Offshore Service and other ECO companies, including FMS.[43]

Plaintiff argues that even if Galliano is formally his employer listed on

his paycheck,[44] Offshore Service and Galliano are an "integrated employer"

for the purposes of his claims.[45]  "[T]he rule has emerged that superficially

distinct entities may be exposed to liability upon a finding that they represent

a single, integrated enterprise: a single employer."   *Trevino v. Celanese*

*Corp.*, 701 F.2d 397, 404 (5th Cir. 1983).  The four-part *Trevino* test to

establish whether firms are single employers considers (1) interrelation of

---

[40]    R. Doc. 70-5 at 49, ¶ 12 (Declaration of Dionne Chouest Austin).
[41]    *Id.*
[42]    *See* R. Doc. 70-2 at 80 (22:7-8).
[43]    *See Id.* at 9 (9:7-9).
[44]    R. Doc. 70-3 at 28 (Sutherland Deposition at 127:16-20).
[45]    R. Doc. 70-1 at 1, 8, ¶¶ 1, 26 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue).

operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997) (citing *Trevino*, 701 F.2d at 404). The second factor is the most important, and courts "refin[e] their analysis to the single question[:] 'What entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Id.*

Regarding that second factor, plaintiff introduced several facts that point towards centralized control of labor relations between Galliano and Offshore. Brett Borne, "corporate director of HR" for all ECO companies,[46] indicated that members of the Chouest family made decisions on employee pay for ECO employees.[47] Dionne Chouest Austin expressly acknowledged participating in the decision to stop employing mariners at the Topship shipyard and to pay only hourly rates without housing and meals.[48] This evidence demonstrates that "final decisions regarding employment matters" for Galliano and other ECO companies, including decisions related to plaintiff, were made by the same decisionmakers. *Id.* Austin serves as

---

[46]   R. Doc. 70-2 at 41-42 (Borne Deposition at 8:21-9:15).
[47]   *Id.* at 43-44 (Borne Deposition at 44:23-45:2).
[48]   R. Doc. 70-2 at 81 (Austin Deposition at 50:2-16).

general counsel to all ECO entities, including Galliano.[49]   Additionally,
plaintiff showed that the ECO companies share human resources and
benefits departments.  As noted, Brett Borne oversaw "the human resource
functions for [all] [ECO] companies."[50]   Borne also stated that he is "in
charge" of the ECO benefits department.[51]  Further, Borne testified that Gina
Cheramie/Pitre[52] is both the benefits director of Galliano and "help[s]
oversee some of the other sites" in her role as benefits director of ECO in
general.[53]   These facts are sufficient to establish the essential second factor
of the *Trevino* test.

Plaintiff also presented evidence satisfying the remaining *Trevino*
factors.  He established interrelation of operations among the ECO
companies.  Galliano is the payroll company for Offshore Service, which
provides vessels.  Human resource functions are centrally managed across
ECO companies.   Further, plaintiff's employment paperwork contains

---

[49]   R. Doc. 70-5 at 48, ¶ 2 (Declaration of Dionne Chouest Austin).
[50]   R. Doc. 70-2 at 43 (Borne Deposition at 8:13-9:24).
[51]   *Id.* at 45 (Borne Deposition at 54:11-13).
[52]   Plaintiff refers to Gina Cheramie and Gina Pitre as the same individual and defendant never contests the depiction.
[53]   *Id.* at 51 (Borne Deposition at 76:13-21).   Cheramie/Pitre's email signature describes her title as "Benefits Director, Edison Chouest Offshore." R. Doc. 70-2 at 56 (FMLA Email and Attachments).  An attachment sent through her email describes her as "Benefits Director/ Galliano Marine Services."  *Id.* at 62.

references to Galliano, ECO, Edison Chouest Offshore, Edison Chouest Offshore, L.L.C., and Chouest Health Group. [54]  Many of these documents contain references to more than one ECO company within the same document.[55]  Austin serves as an officer, along with Dino Chouest, of both Galliano and Offshore.[56]  Both firms are domiciled at 16201 East Main Street, Cut Off, Louisiana 70345.[57]  Furthermore, Austin stated that she serves as general counsel for all ECO companies, including Galliano and Offshore Service.[58]  For all of the foregoing reasons, plaintiff satisfies the *Trevino* test. Galliano and Offshore Service are a single employer for the purposes of his claims.

###        2.      *Exhaustion of Administrative Remedies and Timeliness*

The Court next considers whether plaintiff timely exhausted his administrative remedies against defendants.  Defendants argue that plaintiff failed to bring EEOC charges against the appropriate parties within the applicable deadline.

Before filing suit against an employer for a violation of the ADA, an employee must comply with the ADA's administrative prerequisites.  *See*

---

[54]   R. Doc. 70-2 at 1-38 (Employment Paperwork).
[55]   *See id.* at 1.
[56]   *Id.*
[57]   *Id.*
[58]   R. Doc. 70-5 at 48, ¶ 2 (Declaration of Dionne Chouest Austin).

*Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996). The ADA incorporates the enforcement procedures of Title VII of the Civil Rights Act of 1964, set forth in 42 U.S.C. § 2000e-5. *See* 42 U.S.C. § 12117. Accordingly, a plaintiff must file a timely charge of discrimination with the EEOC and receive a statutory right-to-sue letter before filing suit in federal court. *Dao*, 96 F.3d at 788-89. The amount of time that a plaintiff has to file a charge with the EEOC depends on whether the unlawful practice occurred in a "nondeferral" state or a "deferral" state. *Clark v. Resistoflex Co.*, 854 F.2d 762, 765 (5th Cir. 1988). Louisiana is a deferral state for purposes of the ADA and the ADEA, which means that plaintiff was required to file his charge within 300 days of the alleged unlawful employment act. *See Talas Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017); *Walton-Lentz v. Innophos, Inc.*, 476 F. App'x 566, 570 (5th Cir. 2012); *Conner v. La. Dep't of Health and Hosps.*, 247 F. App'x 480, 481 (5th Cir. 2007) (citing La. R.S. 51:2231 *et seq.*).

Further, the "unnamed party rule," a general rule followed by the Fifth Circuit, is that "a party not named in an EEOC charge may not be sued under Title VII." *Simbaki, Ltd.*, 767 F.3d at 481. Defendants point out that Plaintiff's initial charges named only Edison Chouest, the now-dissolved predecessor of Offshore Service, and FMS.

15

The Fifth Circuit has recognized two exceptions to the unnamed party rule: "identity-of-interests" and "actual notice." *Id.* at 484.  The identity-of-interest test is as follows:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
>
> 2) whether, under the circumstances, the interests of a named [party] are so similar [to] the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
>
> 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;
>
> 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 482-83 (quoting *Glus v. G.C. Murphy Co.*, 562 F.2d 880 (3d Cir.1977)). Under the actual notice test, if the "'unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance,' . . . 'the charge is sufficient to confer jurisdiction over that party.'" *Id.* at 483 (quoting *Eggleston v. Chicago Journeymen Plumbers' Local Union*, 657 F.2d 890, 905 (7th Cir. 1981)).

The undisputed facts show that Offshore Service had actual notice of the EEOC charge.  Indeed, Brett Borne is the joint human resources director

16

for all ECO companies, including Offshore Service, and acknowledged in his deposition that he received the charge against Edison Chouest.[59]  Moreover, the EEOC never attempted conciliation in this case.  Thus, Offshore Service was not deprived of the opportunity to participate in EEOC proceedings.  *See, e.g.*, *Brodie v. New York City Transit Auth.*, No. 96-6813, 1998 WL 599710, at *7 (S.D.N.Y. Sept. 10, 1998) ("In general, where the EEOC makes no [effort at investigation or conciliation], courts will find that the unnamed party has experienced no prejudice.").  Accordingly, the Court finds that Offshore Service received actual notice of the EEOC charge and cannot rely on the unnamed party rule.

Furthermore, because Offshore Service and Galliano are a single employer, "notice to one [is] notice to the other." *Sedlacek v. Hach,* 752 F.2d 333, 336 (8th Cir. 1985).  Thus, Galliano also cannot rely on the unnamed party rule.

The Court's ruling as to notice is consistent with the Supreme Court's admonition that "a technical reading [of Title VII's and the ADA's procedural provisions] would be particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 397 (1982) (internal quotations

---

[59]    R. Doc. 70-2 at 48-49 (Borne Deposition at 66:23-69:13).

marks and citation omitted); *see Banda v. Owens Corning Corp.*, No. 17-1787, 2018 WL 6726542, at *13 (N.D. Tex. Dec. 21, 2018), *appeal dismissed*, No. 19-10075, 2019 WL 3297257 (5th Cir. Mar. 12, 2019).

Plaintiff brought EEOC charges against Edison Chouest[60] on November 1, 2018—within the 300-day deadline for all alleged "discriminatory acts" that occurred on January 10, March 8, March 28, and September 4.[61]  Because this charge was sufficient to notify Offshore Service and Galliano, plaintiff exhausted his administrative remedies by timely bringing the EEOC charge against Edison Chouest.

## B.    Americans with Disabilities Act

The Fifth Circuit applies the *McDonnell Douglas* burden-shifting framework to ADA claims.  *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019).  Under this formula, plaintiff carries the initial burden of establishing a *prima facie* claim of discrimination.  *Id.* at 341.  If he succeeds, the burden shifts to the defendants to articulate a "legitimate, non-discriminatory reason" for the action.  *Id.*  Finally, if defendants satisfy their burden, the burden shifts back to plaintiff to show pretext.  *Id.*

---

[60]    R. Doc. 70-5 at 14 (EEOC Charge Against Edison Chouest).
[61]    R. Doc. 70 at 14.

To carry his initial burden of proving a *prima facie* discrimination claim under the ADA, plaintiff must establish "(1) he has a disability or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision because of his disability." *Id.* (citing *Williams v. J.B. Hunt Transp.*, 826 F.3d 806, 811 (5th Cir. 2016)).

### 1.   Direct Threat

The primary question raised by the parties' briefing is whether plaintiff was a "direct threat" and thus not qualified to serve as a master.[62]  The ADA provides that "[employment] qualification standards may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(3) (internal quotation marks omitted).  The EEOC defines a "direct threat" as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."  29 C.F.R. § 1630.2(r).

When an employer relies on a medical evaluation to conclude that employee poses a direct threat, the Fifth Circuit has held that "the question is whether [the employer] reasonably concluded that [the employee] posed a

---

[62]   R. Doc. 60-2 at 17.

direct threat via an individualized assessment that relied on the best available objective evidence." *Nall*, 917 F.3d at 344; *see* 29 C.F.R. § 1630.2(r). The Fifth Circuit in *Nall* prescribed the following framework for evaluating a direct threat defense: "[T]he question is whether there is any evidence in the record that creates a genuine issue of material fact as to whether [defendant] meaningfully assessed [plaintiff's] ability to perform his job safely and reasonably concluded that he posed a direct threat." *Nall*, 917 F.3d at 344. Whether an employer appropriately makes a direct threat determination depends on first, whether defendant conducted a "meaningful assessment" that is individualized and based on the essential functions of the job, and second, whether that assessment led the employer to reasonably conclude that the employee posed a threat to the safety of himself or others "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." *Id.* at 342 (quoting *Echazabal v. Chevron U.S.A., Inc.*, 536 U.S. 73, 86 (2002) (internal quotation marks omitted)). The U.S. Supreme Court and the Fifth Circuit have "made clear" that an employer's direct threat determination must not result from a "categorical conclusion that an employee with a particular disability cannot safely perform a job." *Id.* at 344 (citing *Echazabal*, 536 U.S. at 86).

Plaintiff admits that Dr. Duet, the FMS physician who examined Sutherland, "never cleared Mr. Sutherland for maritime service, and based on Dr. Duet's medical opinion, Galliano could not safely schedule Mr. Sutherland for a job that required him to work offshore."[63]  In other words, plaintiff admits that Dr. Duet's opinion goes to Sutherland's ability to "perform his job safely."  He apparently argues that the assessment was not "meaningful" or that defendant did not "reasonably conclude[]" that Sutherland posed a direct threat.  *Id.*

### i.   *Meaningful assessment*

The Court's determination of whether defendants meaningfully assessed plaintiff's ability to perform his job safely turns on whether defendants made an "individualized assessment" based on the "essential functions" of Sutherland's job as a master.  *See id.* at 342, 344.

To establish essential job functions, "written job descriptions warrant deference," but the question is "'whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential.'"  *EEOC v. Vicksburg Healthcare, L.L.C.*, 663 F. App'x 331, 335 (5th Cir. 2016) (quoting *EEOC v. LHC Grp.*, 773 F.3d 668, 697-98 (5th Cir.

---

[63]    R. Doc. 70-1 at 7, ¶ 17 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue).

2014)). Thus, "a written job description is not given dispositive weight in the face of contrary evidence." *Id.* Here, Galliano's master job description is the only evidence provided by either party on the essential functions of Sutherland's job.[64]

Among the numerous responsibilities and functions contained in the job description, a master is responsible for "[t]he safety of life on board" and the "safe and efficient running of the vessel."[65] A master performs several safety-related "marine functions," "emergency response functions," and "supervisory functions."[66] The job description also mentions "physical demands" and the frequency with which a master must perform various tasks.[67] A master is "[r]equired to have sufficient cardio-respiratory fitness to perform medium-heavy physical labor involving the ability to sit and/or stand for extended time frames, walk for prolonged periods, handle various

---

[64]     R. Doc. 60-3 at 19-23 (Master Job Description) (provided by defendant); R. Doc. 70-4 at 69-73 (Master Job Description) (provided by plaintiff).

[65]     R. Doc. 70-4 at 69-70 (Master Job Description).

[66]     *Id.* at 70-72.   For instance, among other marine functions of the master's job, a master must "[p]erform any duty that may be required as part [of] training" and must work a "rotation watch involving 12 hours in a 24 hours period with occasional hours not to exceed 14 consecutive hours." *Id.* at 70.  One of the master's emergency response functions is "controlling and operating firefighting equipment." *Id.* at 70-71.

[67]     *Id.* at 72-73.

tools, climb ladders, and climb stairwells."[68]  The description indicates that

a master's general physical activities includes walking "constantly," meaning

between 67% and 100% of work time.[69]  Moreover, "the ability to perform a

job without risk to one's health or safety" is an essential function on its own.

*See Echazabal*, 536 U.S. at 77-78 (reversing the Ninth Circuit's holding that

the ability to perform a job without risking one's own health and safety is not

an essential function).

     Plaintiff argues that Dr. Duet did not evaluate him under the relevant

essential functions.  First, plaintiff argues that Dr. Duet erred by applying the

U.S. Coast Guard medical guidelines when compliance with those standards

was "not an essential job function."[70]  These guidelines include the Merchant

Mariner Medical Manual (the "Manual") and Guidelines on the Medical

Examinations of Seafarers (the "Guidelines").   The Guidelines describe

"seafarer medical fitness examinations," which are designed to ensure a

seafarer is "medically fit to perform his or her routine and emergency duties

at sea," and that the seafarer does not suffer from a "medical condition" that

is "likely to be aggravated by service at sea, to render him or her unfit for

---

[68]    *Id.* at 72.

[69]    *Id.*

[70]    R. Doc. 70 at 21.

service, or to endanger the health of other persons on board."[71]  The Manual specifically states that "the conditions of coronary artery disease . . . may be deemed too high risk for medical certification."[72]  It also provides that "mariner applicants who do not have the exercise/functional capacity and/or physical ability necessary to perform routine and/or emergency duties may be found unqualified."[73]

Neither defendants nor Dr. Duet ever contended that these guidelines set out essential functions of the master job.  Dr. Duet used the standards as an objective way to measure Sutherland's ability to perform the essential functions required of a master.  The Court finds plaintiff's argument, that Dr. Duet incorrectly took the guidelines for the essential functions themselves, unpersuasive.

Second, plaintiff argues that Dr. Duet improperly relied on the "general job description provided to him," rather than asking Sutherland about his day-to-day essential duties.[74]  Plaintiff failed to provide any evidence that Sutherland's job duties as a master were any different from those stated in the job description.  Absent such evidence, the only evidence before the Court

---

[71]    R. Doc. 70-4 at 36 (Guidelines).
[72]    R. Doc. 70-4 at 27 (Manual).
[73]    *Id.* at 32.
[74]    R. Doc. 70 at 24.

24

of Sutherland's essential duties is his job description.   Dr. Duet acted

appropriately by using the job description as his basis for evaluating plaintiff.

Furthermore, the evidence shows Dr. Duet took these essential

functions into account when he evaluated Sutherland.   Dr. Duet explained

that it is his practice to review the physical demands listed in an employee's

job description when he evaluates an employee for fitness for duty.[75]   He

specifically stated that Sutherland would have had to perform all physical

demands of the master job.[76]   In its list of physical demands, the job

description requires "sufficient cardio-respiratory fitness to perform

medium-heavy physical labor involving the ability to . . . walk for prolonged

periods . . . ."[77]   Dr. Duet concluded that, because plaintiff could complete

only four minutes and twenty-two seconds of the stress test, Sutherland had

"insufficient exercise capacity to safely work in a medium-heavy to heavy

duty job, especially given that, as a Master Captain, Mr. Sutherland would be

working in remote areas to which emergency medical personnel would be

able to timely respond."[78]   Further, it is an uncontested fact that, in making

the decision to maintain Sutherland's restriction on March 9, 2018, "Dr. Duet

---

[75]    R. Doc. 70-3 at 70 (Duet Deposition at 63:2-4).

[76]    *Id.* at 71 (Duet Deposition at 64:9-12).

[77]    R. Doc. 70-4 at 72 (Master Job Description).

[78]    R. Doc. 70-4 at 67, ¶ 7 (Declaration of Dr. Darren Duet).

was not satisfied with Sutherland's ability to safely perform the essential duties of his job . . . ."[79]  Therefore, there is no genuine dispute that Dr. Duet's assessment took into account the essential functions of the master's job.

Next, there is no dispute that Dr. Duet's evaluation of Sutherland was "individualized."  The jurisprudence on individualized assessments cautions employers against relying on "perceptions of a disability based on myth, fear or stereotype" and requires them to evaluate employees in their "actual state."  *Rodriguez v. ConAgra Grocery Prod.*, 436 F.3d 468, 481 (5th Cir. 2006) (internal quotation marks and alterations omitted).  One of the primary goals of the ADA is "to prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics."  *Id.* at 481-82 (quoting *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 29 (1st Cir 2002)).

Dr. Duet's assessment was based on Sutherland's actual state.  The initial medical review, prompted by the disclosure that Sutherland took clonidine, a sedating blood pressure medication, revealed diagnoses of "abnormal EKG" and "irregular rhythm,"[80] which, along with high blood

---

[79]   R. Doc. 70-1 at 6, ¶ 14 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue).

[80]   R. Doc. 70-4 at 91 (Pending Medical Records Form).

pressure, are risk factors for coronary artery disease.[81]   Based on these concerns, Dr. Duet restricted Sutherland from maritime service and conditioned his return on the completion of the specific stress test identified in the Manual.  Plaintiff argues that the Manual sets standards, including a stress test, for evaluating mariners with a "previous" diagnosis of coronary artery disease, and he had not received such a diagnosis.[82]  But plaintiff has not contested that "a treadmill stress test, or its equivalent, is how physicians determine whether a patient has obstructive coronary artery disease."[83] Plaintiff has failed to present evidence showing that Dr. Duet's initial concerns were unjustified or that he failed to take into account plaintiff's actual risk factors for coronary artery disease.

Sutherland could not complete the stress test, lasting only four minutes and twenty-two seconds of the prescribed 7.5 minutes.[84]  Dr. Duet stated that the failure to complete the stress test was significant not only because he could not rule out that Sutherland had coronary artery disease.  As noted earlier, Dr. Duet also found that Sutherland's ability to exercise for only four

---

[81]   R. Doc. 70-3 at 57 (Duet Deposition at 28:13-18); R. Doc. 60-3 at 49 (Duet Deposition at 34:17-20).

[82]   R. Doc. 70 at 21-22.

[83]   R. Doc. 70-1 at 4, ¶ 9 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue).

[84]   R. Doc. 70-1 at 5, ¶ 12 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue).

minutes and twenty-two seconds "is insufficient exercise capacity" to safely work in the medium-heavy to heavy duty master's job, which required Sutherland to work "in remote areas" where emergency medical personnel could not "timely respond."[85]   Sufficient exercise capacity is an express requirement of the master's job description.[86]   The employment decisions here were not based on stereotypes, but on Dr. Duet's individualized medical assessment of plaintiff's actual risks and capabilities.

<em>ii.   Reasonableness</em>

Dr. Duet's assessment provided defendants with a reasonable basis to conclude that Sutherland posed a direct threat to himself or others.  Again, a direct threat determination "must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." *Nall*, 917 F.3d at 342 (quoting *Echazabal*, 536 U.S. at 86) (internal quotation marks omitted).   But, the employer's conclusion does not have to be correct to satisfy the objective reasonableness standard. *Id.* at 346 n.8 ("[A] correct conclusion is not required to satisfy the objective reasonableness standard.").   "[T]he question is not whether the

---

[85]   R. Doc. 60-4 at 4.  Plaintiff does not contest that Dr. Duet reached these conclusions."

[86]   R. Doc. 70-4 at 69-73 (listing various physical demands, physical activities, and other functions that require physical fitness).

employer was correct about the risk the employee posed, but instead concerns whether the employer's decision was objectively reasonable based upon the information before it." *Goode v. BNSF Ry., Inc.*, No. 18-319, 2020 WL 1527864, at *6 (N.D. Tex. Mar. 20, 2020) (citing *Nall*, 917 F.3d at 346 n.8).

The defendants made the initial determination to restrict Sutherland from maritime service on January 10, 2018, because of Dr. Duet's assessment. During that first evaluation, Dr. Duet was presented with an individual who had been prescribed a sedating medication to control his high blood pressure. He considered objective evidence that plaintiff presented risk factors for coronary artery disease besides elevated blood pressure, including an "abnormal EKG" and "irregular rhythm."[87] Based on this evidence, Dr. Duet concluded that Sutherland could not safely perform his duties as master captain without further evaluation via a standard stress test.

Sutherland argues that Dr. Duet acted unreasonably by requiring a stress test because he had not been diagnosed with coronary artery disease, and the Manual discusses a stress test in the context of mariners who had

---

[87]    R. Doc. 70-4 at 91 (Pending Medical Records Form); R. Doc. 70-3 at 57 (Duet Deposition at 28:13-18); R. Doc. 60-3 at 49 (Duet Deposition at 34:17-20).

actually received such a diagnosis.[88]   But plaintiff failed to rebut Dr. Duet's determination that Sutherland's risk factors presented a risk for for coronary artery disease, and it is uncontested that "[a] treadmill stress test, or its equivalent, is how physicians determine whether a patient has obstructive coronary artery disease."[89]   Plaintiff's argument does not undermine the reasonableness of Dr. Duet's decision to restrict Sutherland from maritime duty pending completion of the stress test.

Sutherland also failed to create an issue of fact as to whether defendants lacked an objectively reasonable medical basis to continue to restrict him from the master's job once he failed to complete the stress test. He completed only four minutes and twenty-two seconds of the test, reached 80% of his expected heart rate, and achieved 7 METS.  This was another piece of objective evidence which, beyond failing to alleviate concerns over whether Sutherland had obstructive coronary artery disease, stood out to Dr. Duet as demonstrating "insufficient exercise capacity" to perform the essential physical functions of the master job.[90]  Here, plaintiff urges that Dr. Eilen's assessment of Sutherland's condition and release to work renders Dr.

---

[88]    R. Doc. 70 at 22.
[89]    R. Doc. 70-1 at 4, ¶ 9 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue).
[90]    R. Doc. 70-4 at 67.

Duet's evaluation on March 9 unreasonable.  But the Court notes that Dr. Eilen lacked awareness of most of the duties required in Sutherland's job.[91] Additionally, Dr. Eilen's testimony, which plaintiff relies on to argue that Dr. Duet's evaluation of the non-diagnostic stress test was unreasonable, suggests only that defendants would need another stress test to rule out coronary artery disease.[92]  This is precisely what Dr. Duet asked Sutherland to undergo, and he even "advised Mr. Sutherland ways in which he could better his stress test results."[93]  There is no evidence Sutherland sought another test.  Plaintiff did not present evidence showing that Dr. Duet's conclusion that Sutherland posed a direct threat to himself or others in the master's job was objectively unreasonable. *See Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015) ("Reasonable doctors of course can disagree—as they disagree here—as to whether a particular employee can safely perform the functions of his job.  That is why the law requires only that the employee rely on an 'objectively reasonable' opinion, rather than an opinion that is correct.").  Once defendants properly made a direct threat determination, they were entitled to take adverse employment action,

---

[91]    R. Doc. 70-4 at 4 (Eilen Deposition at 11:4-6).
[92]    R. Doc. 70-1 at 7-8, ¶ 15 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue) (citing Eilen Deposition at 42:9-44:18)
[93]    R. Doc. 70-4 at 67, ¶ 8 (Declaration of Dr. Darren Duet).

including termination, against Sutherland. *See Hickman v. Exxon Mobil*, 540 F. App'x 277 (5th Cir. 2013) (Mem.) (unpublished) (affirming summary judgment where employer terminated employee based on a direct threat determination that the employee was unqualified for her job); *Gonzales*, 176 F.3d at 838 (finding that an employee is not qualified for his job when a doctor "perform[s] an individualized assessment of [the employee's] medical condition and, based on that assessment, conclude[s] that his [condition] prevents" the employee from performing the essential functions of the job."). Accordingly, defendants are entitled to summary judgment on their direct threat defense to plaintiff's ADA claim.

### 2.   *Legitimate, Nondiscriminatory Reason*

In the alternative, the Court finds that even if the absence of a diagnosis of coronary artery disease created an issue of fact as to the applicability of the direct threat defense, defendants' documented concerns over plaintiff's ability to perform his job safely are a legitimate, nondiscriminatory reason for the allegedly adverse employment action. *See Nall*, 917 F.3d at 348 (differentiating between safety concerns, which may be   a legitimate, nondiscriminatory reason, and concerns about a physical impairment, which is not a legitimate, nondiscriminatory reason); *Ericson v. Magic Steel Corp.*, No. 93-809, 1994 WL 775442, at *3 (W.D. Mich. Nov. 3, 1994) (granting

summary judgment where defendant "proffered non-pretextual, legitimate, non-discriminatory reasons for its challenged employment conduct" including that "he could not perform [his] duties because he could not be on his feet for more than four hours during an eight-hour shift").

### 3. Pretext

Because defendants showed a legitimate, nondiscriminatory reason for restricting Sutherland from the master's position, plaintiff must "produce evidence from which a jury could conclude that [defendants'] articulated reason is pretextual." *Nall*, 917 F.3d at 342. To show pretext, plaintiff must offer sufficient evidence to show that either "(1) the defendant[s'] reason is not true," or "(2) that the defendant[s'] reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic." *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 702 (5th Cir. 2014) (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)). The gravamen of plaintiff's ADA claim is that he was demoted and removed from the position of master.[94] Defendants proffered reason, as set forth above, was that they were unable to conclude that plaintiff could safely perform the essential functions of the master's position. Plaintiff fails to show that defendants' reason was pretextual.

---

[94]   R. Doc. 1 at 3-5, 7, ¶¶ 13-20, 30, 35.

To show pretext, plaintiff "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212 (5th Cir. 2001) (Title VII case)*; see Kent v. Roman Catholic Church of Archdiocese of New Orleans*, No. 96-1505, 1997 WL 30201, at *3 (E.D. La. Jan. 23, 1997) (granting summary judgment where "plaintiff has submitted no evidence that defendant's reasons were pretexts for discrimination").   Plaintiff states, without support, that he can "prove pretext by showing that [d]efendants' concerns were tied to Sutherland's physical impairments."[95]  Plaintiff is apparently relying on *Nall*, where the Fifth Circuit found that an employer's expressed reason for terminating the employee, safety concerns, "were not tied to [the employee's] ability to perform the tasks required of his job" and were instead "tied to his physical impairment."   917 F.3d at 348.   But plaintiff's bare assertion is contradicted by his admission that "Dr. Duet maintained Sutherland's restriction from maritime service and further limited him to 'light duty,' given that Dr. Duet was not satisfied with Sutherland's ability to safely perform the essential duties of his job."[96]  Further, plaintiff does not dispute that he could complete only half of a 7.5 minute stress test and that he had a

---

[95]     R. Doc. 70 at 27.

[96]     R. Doc. 70-1 at 6, ¶ 14 (Plaintiff's Statement of Contested Material Facts Presenting a Genuine Issue).

job that required constant walking and medium to heavy labor.  Nor does he dispute that he presented multiple risk factors for coronary artery disease, which defendants were unable to rule out because he did not complete a stress test.  Plaintiff provided no evidence that defendants falsely or incredibly asserted that their actions were based on concerns that plaintiff could not safely perform the essential functions of his job.  *Id.* at 348. Defendants' reason for removing Sutherland as a master was because of Dr. Duet's determination and because of the safety risks he presented.  There is no evidence that these reasons were untrue or unworthy of credence. Plaintiff has not produced evidence that defendants' actions were motivated by untested stereotypes.

Plaintiff's other efforts to show pretext are based on what he claims are inconsistent statements by the defendant on matters that are unrelated to the medical evaluation process.  For example, he makes an argument that he was offered a job at Topship in October 2018, showing that "the defendants were still employing individuals at Topship after September of 2018."[97]  But defendants never argued they were not employing workers at Topship, only that it was not financially reasonable for them to do so at the day rate Sutherland was receiving.  If anything, these facts support defendants'

---

[97]    R. Doc. 70 at 27

argument that they stopped employing Sutherland as a mate for economic reasons, not discriminatory ones.

Plaintiff also relies on a letter informing him that he could be terminated once his FMLA benefits are exhausted if he is unable to return to work.[98]  The Court fails to see how this raises an inference of pretext.

The Court finds that Plaintiff failed to create an issue of fact that defendants proffered reason for his removal from the master's job was pretextual.  For this alternative reason, defendants are entitled to summary judgment on plaintiff's ADA claim.

## C.    Age Discrimination in Employment Act

Like the disability discrimination claim outlined above, the Fifth Circuit also employs the burden-shifting framework outlined in *McDonnell Douglas* for age discrimination claims.  *See Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010).  Under this framework, plaintiff must first establish a *prima facie* case by showing "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside of the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Jackson*, F.3d at 378.  Once a plaintiff has

---

[98]     *Id.*

established a *prima facie* case of discrimination, the "burden shifts to the employer to produce a legitimate, nondiscriminatory reason for her termination." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). And should an employer produce a legitimate, non-discriminatory reason for termination, the burden then shifts back to plaintiff, who must produce "substantial evidence that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Id.* Even if pretext is shown, it may be insufficient to establish discrimination "when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision," or "when the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination occurred." *Id.*

Defendants argue that Sutherland cannot satisfy the second element because he posed a "direct threat" and therefore was not qualified to serve in the master position. Additionally, defendants argue that plaintiff failed to carry its burden on the fourth element, that the adverse employment action occurred because of his age. The first and third prongs—that Sutherland faced adverse employment action and was within the protected class—are not disputed.[99]

---

[99] *See* R. Doc. 60-2 at 21.

### 1.    *Qualified*

As discussed above, defendants appropriately determined that Sutherland was not qualified for the master position.

In his response to defendants' motion for summary judgment, Sutherland makes an argument for the first time that he was qualified for the light-duty position of mate.[100]   Plaintiff failed to raise this claim in his EEOC charges[101] and in the complaint[102] filed in this Court.  The Court may not hear plaintiff's discrimination claim unless it is first brought in an EEOC charge. *See Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012) ("Ordinarily, an employee may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not 'reasonably be expected to grow out of the charge of discrimination.'" (quoting *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)). Additionally, "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d

---

[100]     R. Doc. 70 at 28

[101]     R. Doc. 70-5 at 14 (EEOC Charge Against Edison Chouest); R. Doc. 70-5 at 13 (EEOC Charge Against FMS); R. Doc. 70-3 at 50 (EEOC Charge Against Galliano).

[102]     R. Doc. 1 at 3-5, 7, ¶¶ 13-20, 30, 35.

108, 113 (5th Cir. 2005).  This claim is not properly before the Court, and the Court will not entertain it.

### 2.   *Because of Age*

To establish the fourth element—that he was discharged because of his age—Sutherland points the Court to two "remarks."[103]  First, Dr. Duet allegedly called Sutherland a "ticking time bomb."[104]  Second, a statement provided by Metlife to Sutherland states "old age."[105]  Both statements fail to establish the fourth element of the age discrimination claim.

Remarks may be the basis for age discrimination claims either as "direct evidence of discrimination" or as "circumstantial" evidence. *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015). When a plaintiff seeks to use comments to "prove the entire case of discrimination" the Fifth Circuit employs the *CSC Logic* test.  *Id.* (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).  Under this test, comments may constitute direct evidence of age discrimination if they are "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment

---

[103]   R. Doc. 70 at 29-31.
[104]   R. Doc. 70 at 30; R. Doc. 70-3 at 82 (Dr. Duet Deposition at 118:5-18).
[105]   R. Doc. 70 at 30; R. Doc. 70-5 at 53 (Metlife Explanation of Benefits).

decision at issue; and 4) related to the employment decision at issue." *Ray v. United Parcel Serv.*, 587 F. App'x 182 (5th Cir. 2014) (quoting *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000)).  In a circumstantial case, where "discriminatory remarks are just one ingredient in the overall evidentiary mix" the Court applies a "more flexible" two-part standard. *Goudeau*, 793 F.3d at 475 (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012)).  A plaintiff must show "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker."

Even with the more flexible circumstantial evidence test, plaintiff has not satisfied his burden of proof.  On its face, the "ticking time bomb" statement does not relate to age.  Further, the evidence in the record reflects that Dr. Duet was referring to plaintiff's heart.[106]  Because plaintiff failed to point to any evidence showing that Dr. Duet was referring to Sutherland's age, plaintiff failed to show discriminatory animus.

Even more obviously, the "old age" statement on the Metlife form fails as a basis for an age discrimination claim.  The form is an "explanation of

---

[106]    R. Doc 70-3 at 82 (Duet Deposition at 118:5-18).

benefits" for plaintiff's short-term disability plan.[107]   The section for tax deductions lists several line-items, including "FICA – Old Age" and "FICA – Medicare."   Plaintiff points to the reference to "Old Age" and asks the Court to draw an inference that "[d]efendants provided information to Metlife, and Metlife used that information to reference Sutherland's age."[108]

FICA refers to taxes under the Federal Insurance Contributions Act, which applies to (1) social security and (2) Medicaid.   As plaintiff himself explains, "[t]he Social Security portion [of FICA] refers to *Old-Age*, Survivors, and Disability Insurance (OASDI)."[109]   Defendants point out that the likely reason that the form contains the "Old Age" statement is because it is referring to OASDI.[110]   Even absent this obvious explanation, plaintiff points to no evidence showing discriminatory animus behind the statement or that Metlife had influence over employment decisions at defendants' companies.

Because plaintiff has failed to establish a *prima facie* claim of age discrimination, the Court grants defendants' motion for summary judgment on the ADEA claim.

---

[107]   R. Doc. 70-5 at 53 (Metlife Explanation of Benefits).
[108]   R. Doc. 70 at 30.
[109]   *Id.* (emphasis added).
[110]   R. Doc. 74 at 12.

### D.    Louisiana Employment Discrimination Law

Defendant also moves for summary judgment on plaintiff's LEDL claims.  The LEDL prohibits both age and disability discrimination.  *See* La. R.S. 23:312 (prohibiting age discrimination); La. R.S. 23:323 (prohibiting disability discrimination).

With respect to claims of age discrimination, the LEDL is modeled after federal law and should be construed in light of federal precedent.  *See, e.g.*, *O'Boyle v. La. Tech Uni.*, 741 So. 2d 1289, 1290 (La. App. 2 Cir. 1999) (holding that the Louisiana Act "mirrors the federal ADEA and should be construed in light of federal precedent.").  Indeed, Louisiana courts apply the same *McDonnell Douglas* burden-shifting framework when analyzing claims of age discrimination under the Louisiana law. *See Taylor v. Oakbourne Country Club*, 663 So.2d 397, 383-84 (La. App. 3 Cir. 1995).  For the reasons explained above, plaintiff's claim for age discrimination under the ADEA does not survive summary judgment.  For the same reasons, defendants are entitled to summary judgment on plaintiff's LEDL claim for age discrimination.

The same result obtains for plaintiff's claim of disability discrimination under the LEDL.  Louisiana's disability discrimination protections are based on the ADA, and the Court's analyses under the LEDL and the ADA are the

42

same.  *See, e.g.*, *Barton v. Checkers Drive-In Rests.*, Inc., No. 11-186, 2011 WL 1193061, at *3 (E.D. La. March 28, 2011) ("Because Louisiana's statute is based on the ADA, the result of the court's analysis under either statute must, necessarily, be the same.").  For the reasons the Court granted summary judgment on plaintiff's ADA claim, it grants summary judgment against plaintiff on his LEDL claim for disability discrimination.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment, and dismisses plaintiff's claims WITH PREJUDICE.  As the Court has granted defendants' motion for summary judgment, plaintiff's motion *in limine* is DISMISSED WITHOUT PREJUDICE.

New Orleans, Louisiana, this __10th__ day of September, 2020.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE